133 P.3d 410 (2006)
2006 UT 19
In the Matter of the General Determination of All the Rights to the Use of Water, Both Surface and Underground, Within the Drainage Area of the UINTAH BASIN in Utah.
Strawberry Water Users Association, a Utah nonprofit corporation; and Strawberry High Line Canal Company, a Utah nonprofit corporation, Petitioners and Appellants,
v.
Bureau of Reclamation; United States of America; and Department of the Interior, Respondent and Appellees.
Nos. 20040270, 20040334.
Supreme Court of Utah.
March 24, 2006.
Rehearing Denied May 3, 2006.
*412 Shawn E. Draney, Keith A. Call, Scott H. Martin, Salt Lake City, for Strawberry parties.
Norman K. Johnson, L. Ward Wagstaff, Michael Steeves, Salt Lake City, for Utah State Engineer.
Paul M. Warner, U.S. Att'y, Daniel D. Price, Asst. U.S. Att'y, Salt Lake City, and Kathryn E. Kovacs, Washington, D.C., for Bureau of Reclamation, Department of the Interior.

AMENDED OPINION
McIFF, District Judge:

INTRODUCTION
¶ 1 This appeal probes whether jurisdiction should lie in the federal district court or in the courts of the State of Utah. The dispute centers around competitive applications filed by the Strawberry Water Users[1] and the United States with respect to water imported from the upper reaches of the Duchesne River, a Colorado River tributary, into the Great Basin. The water is collected in the Strawberry Reservoir as part of the Strawberry Valley Project[2] and delivered through a transbasin diversion tunnel for use primarily in the southern end of Utah County. The parties before the court are the Strawberry Water Users, the United States, and the Utah State Engineer.
¶ 2 The Strawberry Water Users argue that the water rights in question are the product of following the application and beneficial use requirements of Utah law and that Utah courts have exclusive jurisdiction to adjudicate claims relating thereto. "[T]he United States disagrees and contends that Strawberry's rights to use water derive solely from its contracts with the United States." It asserts "the proper forum for resolution of Strawberry's contract-based claims is federal district court." The State Engineer has submitted memoranda in partial support of the position of the United States.
¶ 3 The parties have not always been so certain about jurisdiction. This litigation began on April 24, 2001, when the Strawberry Water Users filed a petition for an interlocutory decree in the general adjudication of water rights pending since 1936 in Utah's Third Judicial District Court in and for Salt *413 Lake County.[3] Strawberry named the United States Bureau of Reclamation as respondent. One day later, Strawberry filed an identical petition in the general adjudication of water rights pending since 1956 in Utah's Eighth Judicial District Court in and for Duchesne County.[4] One day after that, it filed an action seeking essentially the same relief in the United States District Court for the District of Utah.[5]
¶ 4 Strawberry's uncertainty has been matched if not exceeded by that of the United States. In support of its motion to dismiss the consolidated case in the federal district court, the United States asserted, "[N]either the state engineer nor the court in this action has jurisdiction to adjudicate title to water rights under Utah law." Further evidence of the uncertainty of the United States is found in its protest of Strawberry's change application filed with the State Engineer:
[A]n adjudication of the [ownership of] water rights is required before a change of use application can be processed by the state engineer for this applicant. However, the authority to adjudicate water rights is vested by the Utah Constitution in the [Utah] courts and not given to the state engineer.... Thus, the applications must be dismissed pending the necessary adjudication.
¶ 5 After Strawberry filed its petitions in the state courts seeking adjudication, the United States made a complete reversal and urged dismissal for failure to exhaust administrative remedies. It later withdrew this argument when the State Engineer granted conditional approval of change applications for both Strawberry and the United States. The condition was that the parties obtain a judicial determination establishing who has the right to file such applications. We think it fair to conclude that the parties have struggled with how best to proceed and that the State Engineer, in particular, both needs and seeks direction. We note that it is not possible to flesh out the jurisdictional issue and provide appropriate guidance without a more extensive discussion of the substance of the dispute than would normally be required at this stage of the proceedings.

THE DECISIONS BELOW
¶ 6 Both the Third and Eighth District Courts dismissed Strawberry's petitions for an interlocutory decree under Utah's general adjudications statute, Utah Code Ann. §§ 73-4-1 to -24 (2004). The dismissal orders are abbreviated and do not contain any legal analysis. The Third District Court stated that it "is not satisfied that petitioners' claims are properly a general adjudication proceeding," and that "petitioners seek to adjudicate ownership of water rights based upon federal contract, which should properly be before the Federal Court." The Eighth District Court essentially agreed but also determined that the United States had not been properly joined in the general adjudication in the Uintah Basin and that suits for interlocutory orders brought under Utah Code section 73-4-24 do not qualify for waiver of federal sovereign immunity under 43 U.S.C. § 666 (2005). Because the petitions sought essentially the same relief in each district court and were dismissed for similar reasons, the appeals of those dismissals have been consolidated.

STANDARD OF REVIEW
¶ 7 We review the district courts' dismissals for lack of subject matter jurisdiction for correctness and accord no deference to their legal conclusions. Beaver County v. Qwest, Inc., 2001 UT 81, ¶ 18, 31 P.3d 1147; *414 see also Petersen v. Bd. of Educ., 855 P.2d 241, 242 (Utah 1993) (applying the correctness standard of review to denial of a motion to dismiss based on governmental immunity).

ANALYSIS

I. REVERSAL WITH GUIDANCE
¶ 8 After thoughtful review we have determined that the dismissals should not stand, but we have also determined that the jurisdictional question does not lend itself to an either/or response. Depending upon how the parties proceed in light of our ruling, there could be issues suitable for either or both state and federal courts. It is our design herein to delineate as best possible between water law issues over which Utah courts have exclusive jurisdiction and contract issues arising under the federal reclamation contracts over which the federal district court has jurisdiction. Moreover, there may be issues as to whether contractual arrangements, even if clear, would run afoul of Utah water law, which the United States Congress has recognized as controlling. To the extent possible at this juncture, we have attempted to provide guidance to the parties. We note particularly our responsibility to correct erroneous interpretations or assumptions of the State Engineer, who ultimately looks to this court for direction regarding application of Utah water law. Before examining the specific legal issues, we think it imperative to briefly outline the history of federal water reclamation projects followed by the particular history of the Strawberry Valley Project and the origin of the dispute between these parties. We also address the matter of the United States' waiver of sovereign immunity regarding disputes arising from reclamation projects.

II. FEDERAL WATER RECLAMATION PROJECTS

A. History[6]
¶ 9 "The final westward migration of the late 1800s resulted in an enormous demand by settlers for irrigation systems." Peterson v. United States Dep't of Interior, 899 F.2d 799, 802 (9th Cir.1990). "As early as 1891, settlers in the western states organized annual irrigation congresses to discuss their water needs and to urge Congress to fund irrigation projects." Id. at 802 n. 6. "Western states themselves lacked the means to finance the enormous systems of dams, reservoirs, and canals needed to regulate and distribute water from the western rivers and snow melt." Id.; see also California v. United States, 438 U.S. 645, 663, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).
¶ 10 "By the turn of the century, most of the land that could be profitably irrigated by small-scale private reclamation efforts had been put to use. Pressure mounted on the Federal Government to provide the funding for massive projects that would be needed to complete the reclamation." California, 438 U.S. at 649, 98 S.Ct. 2985; see also Peterson, 899 F.2d at 802; United States v. Alpine Land & Reservoir Co., 887 F.2d 207, 209 (9th Cir.1989). Responding to the pressing demand for financial assistance in funding reclamation projects, Congress enacted the Reclamation Act of 1902. Pub.L. No. 57-161, 32 Stat. 388 (codified as amended at 43 U.S.C. § 371 (2005)).
With the Reclamation Act of 1902, Congress committed itself to the task of constructing and operating dams, reservoirs, and canals for the reclamation of the arid lands in 17 western states. The projects were to be built on federal land and the actual construction and operation were to be in the hands of the Secretary of the Interior.
Peterson, 899 F.2d at 802 (citing California, 438 U.S. at 650, 664, 98 S.Ct. 2985).
¶ 11 When Congress enacted the Reclamation Act of 1902, it had far greater expectations for the program than to simply increase agricultural production. With the Reclamation Act, Congress created a blueprint for the orderly development of the West, and *415 water was the instrument by which that plan was to be carried out. See Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 292, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). Congress's plan included purposeful and continued deference to state water law, which was to govern the ownership of all water rights absent a clear Congressional directive to the contrary. See California, 438 U.S. at 653-70, 678-89, 98 S.Ct. 2985; United States v. New Mexico, 438 U.S. 696, 702 & n. 5, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). Section 8 of the Reclamation Act left little room for doubt.
Nothing in this Act shall be construed as affecting or intended to affect or in any way interfere with the laws of any state... relating to the control, appropriation, use, or distribution of water . . . and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws. . . .
43 U.S.C. § 383 (emphasis added).
¶ 12 The monies initially provided by Congress under the 1902 Reclamation Act were placed in a separate "Reclamation Fund" to be used by the Secretary of the Interior to fund construction of reservoirs and irrigation works. See, e.g., 43 U.S.C. § 391; Twin Falls Canal Co. v. Foote, 192 F. 583, 585 (C.D.Idaho 1911). Using this fund, the Bureau of Reclamation was able to construct large dam and reservoir projects similar to the Strawberry Valley Project. See, e.g., id.; Burley Irrigation Dist. v. Ickes, 116 F.2d 529, 530 (D.C.Cir.1940).
¶ 13 After construction of a particular reclamation project was completed, the water users or irrigation district, as the contracting party, was required to repay all the construction costs of the project. See 43 U.S.C. §§ 419, 461. In this manner, the Reclamation Fund was to be replenished and used in turn to fund new projects. All monies received thereafter from the sale and disposal of public lands were also to be paid into the fund to the credit of the project on which such lands were located. See 43 U.S.C. §§ 374-375, 391-392.

B. The Strawberry Valley Project[7]
¶ 14 On December 15, 1905, the Secretary of the Interior, acting under authority of the Reclamation Act, authorized construction of the Strawberry Valley Project. The Project was to include a large complex of many different water works, including a series of diversion dams and feeder canals in the upper Duchesne River drainage. These included the Strawberry Dam, the Strawberry Tunnel driven through the Wasatch Mountains from the Strawberry Reservoir on the east side of the said mountains into Sixth Water Creek on the west side, allowing the water to flow down Diamond Fork to its confluence with the Spanish Fork River and farther on down that river to a point of rediversion into delivery canals for beneficial use on lands being acquired principally by homesteaders in southern Utah County.
¶ 15 In anticipation of the Project, one Frank C. Kelsey had filed with the State Engineer Application No. 79 for the appropriation of 100,000 acre-feet of water from the Strawberry River, Trail Hollow Creek, Indian Creek, and Horse Creekall located in the Duchesne River drainage. The application, filed January 27, 1904, provided that the water would be stored in the then-proposed Strawberry Reservoir for release and transbasin diversion for beneficial use in southern Utah County. The application was assigned to the Strawberry Irrigation and Reservoir Committee, a Strawberry predecessor, on May 16, 1905, and was reassigned to the Bureau of Reclamation on August 11, 1905. The Utah State Engineer approved Application No. 79 on January 23, 1906, subject to proof of actual appropriation and beneficial *416 use, which would take many more years to achieve.
¶ 16 The Bureau of Reclamation constructed the Strawberry Valley Project between 1906 and 1915, thus opening the door for homesteaders to make application to beneficially use Project water. Once accepted and approved by the United States, the water rights applications constituted binding contracts between the applicants and the United States. Each applicant became obligated to put the water to beneficial use and to repay a proportionate share of construction costs and annual operation and maintenance costs of the Project. Upon full performance, the applicant became entitled to a certain quantity of Project water annually in perpetuity. A typical patent for the homesteaded lands described the tract "together with the right to the use of water from the Strawberry Valley Reclamation Project as an appurtenance to the irrigable lands in said tract TO HAVE AND TO HOLD . . . unto the said [patentee] and to his heirs and assigns forever."
¶ 17 In 1924, Congress adopted the Fact Finders Act, Pub.L. No. 68-292, 43 Stat. 702 (codified as amended at 43 U.S.C. § 500 (2005)). This Act mandated that operation and maintenance of reclamation projects be turned over to a water users association or an irrigation district. Thereafter, the United States was obliged to deal with associations or districts rather than thousands of different individual water users. The Strawberry Water Users Association had actually been formed in 1922 for the very purposes contemplated by the Fact Finders Act, which was adopted two years later. Virtually all of the individuals and entities that had entered into contracts with the United States for Project water became Strawberry Water Users Association shareholders. Their water rights were transferred to the Association in exchange for shares of stock. In turn, the Association entered into contracts with the United States to repay the then-unpaid construction costs of the Project, operate and maintain the Project, and deliver water to the Project water users who were now shareholders. The contracts between the Association and the United States, which have governed the relationship of these parties until recent years, are dated September 28, 1926 ("1926 Contract"), November 20, 1928 ("1928 Contract"), and October 9, 1940 ("1940 Contract").
¶ 18 By the early 1930s, the appropriation efforts were complete and proofs of appropriation were filed with the State Engineer. On March 13, 1933, the Engineer issued Certificate of Appropriation No. 2115 (later designated as water right 43-3001) for the 100,000 acre-feet covered by Application No. 79, which had originally been filed in 1904. The certificate was based exclusively upon the beneficial use of Project water by the individual Strawberry users whose contractual interests had been assigned to the Association in exchange for shares of stock. The certificate provided for capture and storage in Strawberry Reservoir, delivery down Diamond Fork into the Spanish Fork River for rediversion into the Highline Canal for irrigation of 53,522.24 acres of land, specifically describing such land, all of which is located in southern Utah County. The certificate was issued in the name of the United States and remains in the name of the United States at present.[8]
¶ 19 On December 23, 1974, the Strawberry Water Users paid the United States the final installment due on construction of the Strawberry Valley Project. This satisfied the combined obligation of all the individual parties who conveyed their rights to the Association in exchange for shares of stock. All costs incurred by the United States in appropriating and perfecting the Strawberry water rights were fully repaid, and the United *417 States no longer held any type of lien on the patented land or the right to use the Project water appurtenant to such land even though the certificates of appropriation remained in the name of the United States.
¶ 20 Were the story to end here, the issues would be easier to frame and to resolve. However, in mid-1985, a decade or more after full performance of the contracts by which Strawberry obtained rights to use Project water in perpetuity, the Strawberry Dam was replaced by the Soldier Creek Dam, a Central Utah Project facility also constructed by the Bureau of Reclamation. The new dam increased the capacity of Strawberry Reservoir from roughly 270,000 acre-feet to more than 1,100,000 acre-feet.[9] After the enlarged reservoir was in place, the parties entered into what they refer to as the 1991 Operating Agreement. Under the terms of this agreement, Strawberry is guaranteed annual delivery of 61,000 acre-feet from the enlarged reservoir. Strawberry's petition alleged that it had historically received some 70,000 acre-feet. The United States in the federal action claims the historical average was 61,500 acre-feet. Whatever the figure, it appears that it no longer varies with the ebbs and flows of wet and dry years, but is fixed at 61,000 acre-feet annually. It also appears that the United States relies heavily upon the 1991 Operating Agreement to advance its arguments in this dispute.

C. Origin of the Current Dispute
¶ 21 The current dispute first arose in August 1997, when Strawberry filed three change applications seeking to update and correctly reflect current points of diversion and place of use of Project water and to provide for municipal and industrial use. More specifically, Strawberry sought the right to use Project water for the irrigation of small lots, including lawns and gardens, as opposed to larger agricultural tracts. In its protest before the State Engineer, the United States claimed that it was the owner of the water and urged the State Engineer to dismiss the Strawberry applications until the ownership issue could be resolved, presumably in Utah courts. After the lawsuits were filed, the United States advanced the further claim that Strawberry is contractually prohibited from changing use without consent of the Secretary of the Interior. In due course, the United States sought to have all matters adjudicated in the federal district court.
¶ 22 Separate and apart from these initial change applications filed by Strawberry are competing applications filed by each of the parties in December 1997 seeking to recapture Project water after it has been fully utilized and passed beyond the control of either party. These applications are extremely ambitious and far-reaching. The application of the United States, filed December 4, 1997, seeks to appropriate 49,200 acre-feet of return flow of Project water for storage in Utah Lake and delivery in Salt Lake County. Strawberry's "exchange application," filed eight days later, seeks to recover the return flow from 64,400 acre-feet by pumping or diverting from existing wells, springs, and streams in southern Utah County. These competitive applications raise fundamental Utah water law issues of first impression that potentially impact appropriators throughout the Jordan River drainage and beyond.

D. Waiver of Sovereign Immunitythe McCarran Amendment
¶ 23 We now consider whether and for what purposes the United States is subject to joinder in either the federal or the state court suits that have been filed. We begin with the proposition that the United States is immune from suit unless Congress has waived that immunity. Lehman v. Nakshian, 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981); In re Bear River Drainage Area, 2 Utah 2d 208, 271 P.2d 846, 848-49 (1954).
*418 ¶ 24 Congress has waived the United States' sovereign immunity for joinder in both federal and state court actions arising out of federal water reclamation projects. It has consented to joinder in federal district court "to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to federal reclamation law." 43 U.S.C. § 390uu (2005) (emphasis added). It has consented to joinder in state court
(1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under state law . . . and the United States is a necessary party to such suit.
43 U.S.C. § 666 (emphasis added).
¶ 25 The consent to joinder in state court came in the McCarran Amendment to the 1902 Reclamation Act. Section 8 of the Act had decreed noninterference with state law "relating to the control, appropriation, use, or distribution of water," and further, that "the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with [state] laws." 43 U.S.C. § 383 (emphasis added). These mandates had limited meaning unless the United States could be compelled to join in state court proceedings. The 82nd Congress came to grips with this problem in 1952 with the adoption of the McCarran Amendment. The Amendment had been preceded by the efforts of most western states to develop orderly and comprehensive procedures for the general adjudication of water rights.
By the time the McCarran Amendment was passed, most Western states had adopted some statutory procedure for the mass adjudication of water rights. While these statutory adjudications seemed to promise an end to the confusing and conflicting adjudication of water rights in multiple cases, the system was impaired by the refusal of the federal government to participate. Since the United States had large landholdings and extensive reserved water rights in the West, its claims of sovereign immunity significantly diminished the value of the comprehensive state adjudications. Congress sought to remedy this problem by enacting the McCarran Amendment in 1952. See S.Rep. No. 755, 82d Cong., 1st Sess. 4-6 (1951).
United States v. Oregon, 44 F.3d 758, 765 (9th Cir.1994) (citation omitted) (emphasis added).
¶ 26 The purposes of the McCarran Amendment are clear, and its language is broad. After providing for joinder, it goes on to state:

The United States when a party to any such suit, shall (1) be deemed to have waived any right to plead that the state laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain a review thereof, in the same manner and to the same extent as a private individual under like circumstances. . . .
43 U.S.C. § 666 (2005) (emphasis added). The United States Supreme Court has characterized the Amendment as "an all-inclusive statute concerning the adjudication of rights to the use of water of a river system which in § 666(a)(1) has no exceptions and which, as we read it, includes appropriative rights, riparian rights and reserved rights." United States v. Dist. Court in and for the County of Eagle, 401 U.S. 520, 524, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) (internal quotations omitted). Here the courts are dealing with "appropriative rights" and competing claims of ownership, the right to file change applications, and the competitive claims seeking to capture and use return flow water. In the language of the Supreme Court, and the Amendment, these issues relate to "the adjudication of rights to the use of water of a river system." Id. (emphasis added). While there are contract issues that need to be addressed by the federal district court, there are also important water law issues that will ultimately need to be addressed by Utah courts.

*419 III. STRAWBERRY'S PETITIONS AND THE UNITED STATES' RESPONSE
¶ 27 Strawberry advanced three claims for relief in the petitions filed in the general adjudications in the Third and Eighth District Courts. First, it sought a declaration that Strawberry, for the use and benefit of its shareholders, holds equitable title to Project water which the shareholders have applied to beneficial use over approximately the last ninety years. It claims this ownership extends to the right to recapture return flows. Second, Strawberry sought a declaration that the Association and the individual water users have the right to use the water for purposes of irrigation regardless of the size of the tract. Finally, Strawberry sought a declaration that it has the right to file change applications with the State Engineer without the consent or approval of the United States.
¶ 28 Strawberry bases its petition before us on Utah water law. The State Engineer also addresses the issues from the standpoint of Utah water law but misapplies both statutory provisions and certain decisions from this court. The United States makes no attempt to discuss Utah water law, nor does it undertake to identify any contractual provisions which it claims to be relevant or to have been violated. The depth of its legal analysis in the briefing before this court is to point to the fact that in its petitions in state courts, Strawberry recounted the history of the Strawberry Valley Project and the contractual relationship of these parties. From this the United States concludes: "Thus the Petitions themselves assert that the water rights at issue derive from contracts entered into pursuant to federal reclamation law," and further, "Strawberry's rights to use water derived solely from its contracts with the United States." While this assertion is repeated more than once, it is wholly conclusory and without analytical support.
¶ 29 The fact that two parties contract with each other to cooperatively pursue a certificated right to the use of water belonging to the people of the State of Utah does not lead to the conclusion that the water rights "derive from contracts" or that the rights of one derive from its contract with the other. That is a simplistic surface analysis that disregards the source of the water rights. The rights of both parties derive from the State of Utah through their joint effort in following the appropriation procedure outlined by statute. Simply stated, the foundation of these water rights is an approved application to appropriate followed by actual beneficial use on the ground. As stated in Robinson v. Schoenfeld, 62 Utah 233, 218 P. 1041, 1043 (1923), "The sine qua non of making a valid appropriation is and was to apply the water attempted to be appropriated to some beneficial use." The contracts between these parties were designed to facilitate this process, but they are not the source of the right to use the water.
¶ 30 In an effort to understand the substantive legal position of the United States in this dispute, we have been compelled to examine not only its limited response here, but the more extensive disclosures in its counterclaim in the federal district court, attached as an addendum to its brief. As set forth in its counterclaim, the United States asserts that it "is the owner in fee of the Strawberry Valley Project facilities and the record title owner of the Strawberry Valley Project water rights" and that "it was ... the intent of congress that these project water rights remain permanently in federal control." In support of this claim, the United States cites 43 U.S.C. §§ 383, 498. Neither of these sections supports the claim with respect to water rights as opposed to Project facilities, nor does applicable case law. See Nevada, 463 U.S. at 125-27, 103 S.Ct. 2906 (citing Ickes v. Fox, 300 U.S. 82, 94-95, 57 S.Ct. 412, 81 L.Ed. 525 (1937)). These decisions stand for the proposition that "the water-rights became the property of the land owners, wholly distinct from the property of the government in the irrigation works." Nevada at 125, 103 S.Ct. 2906; Ickes at 95, 57 S.Ct. 412.
¶ 31 The United States proceeds to repeat its claims that "[t]he Association's right to the use of the project facilities and water from the federally owned SVP water rights were solely and totally contractual from their inception." There is nothing new in this, but there is in that which follows. The United *420 States then asserts that when the Association entered into the 1991 Operating Agreement, it "did not retain their [sic] contractual interests in Strawberry Valley Project water rights as provided under the 1926, 1928 and 1940 contracts, but instead gave them up in return for a contractual interest in a guaranteed water supply." Perhaps most revealing and germane to the jurisdiction inquiry is the allegation with respect to return flows. The United States asserts:
The right to use return flows within the SVP service area was given to the Highline Canal Company through a contract with the United States. The Association has not used them in the nearly 100 years of the SVP's existence and still cannot recapture them within the boundaries of the SVP. Under state law, since the return flows result from a transbasin diversion the United States may track and reuse the return flows. . . . The Association gave up its right to the Strawberry Valley Project water rights in the 1991 Agreement and therefore has no claim to return flows, which derive from the initial water rights.
(Emphasis added.)
¶ 32 The foregoing reveals why the underlying facts of this case do not lend themselves to a determination that jurisdiction rests in but one place, state or federal. The 1991 Operating Agreement is not before us, nor are the earlier agreements of 1926, 1928, and 1940. Under 43 U.S.C. § 390uu (2005), it is the prerogative of the federal district court to examine the contractual relationship and "to adjudicate, confirm, validate, or decree the contractual rights . . . regarding any contract executed pursuant to Federal reclamation law." (Emphasis added.) Separate and apart from this prerogative is the prerogative of Utah courts to determine how the contractual relationship plays out under Utah water law. That law cannot be changed by contract. We reiterate that the Secretary of the Interior in carrying out the provisions of the Reclamation Act is obliged to "proceed in conformity with [state] laws. . . relating to the control, appropriation, use, or distribution of water." 43 U.S.C. § 383 (emphasis added). Further, we note and underscore that the United States presumes more than it should when it undertakes to articulate Utah law regarding return flows from a transbasin diversion.
¶ 33 We cannot here resolve all the competing claims, including the ultimate issues regarding return flow, which we envision will come to us at a future time. Accordingly, we tailor our discussion to correction of misstatements of Utah water law advanced in the briefs and to identification and examination of the underlying substantive issues sufficient to determine whether and to what extent jurisdiction rests in state or federal court. The difficulty of the task and the demonstrated uncertainty of the parties has compelled us to move beyond a surface analysis. We look first at the so-called "ownership" issue and the certificate of appropriation.

IV. WATER OWNERSHIP IN UTAH

A. A Use-Based Concept
¶ 34 In navigating a course through Utah water law, it is easy to be misled by the word "ownership." In some respects it is a misnomer. It is only the right to use water that is subject to ownership. The first and over-arching principle of Utah water law is this: "All waters in this state, whether above or under the ground, are hereby declared to be the property of the public, subject to all existing rights to the use thereof." Utah Code Ann. § 73-1-1 (2004) (emphasis added). Of equal importance is the second fundamental principle: "Beneficial use shall be the basis, the measure and the limit of all rights to the use of the water in this state." Id. § 73-1-3 (emphasis added). Throughout its history, this court has uniformly recognized that title to "public water is not subject to private acquisition ... even by the federal government or the state itself." See, e.g., Adams v. Portage Irrigation, Reservoir & Power Co., 95 Utah 1, 72 P.2d 648, 652-53 (1937). The State, acting as trustee rather than owner, has assumed the responsibility of allocating the use of the water for the benefit and welfare of all the people. J.J.N.P. Co. v. State, 655 P.2d 1133, 1136 (Utah 1982).
*421 ¶ 35 Notwithstanding these clear and controlling directives, the "ownership" label continues to be part of the vernacular of Utah water law. However, the word has varying meanings and applications that lack the breadth and finality that "ownership" suggests in other contexts. As held in United States v. District Court of Fourth Judicial District in and for Utah County, 121 Utah 1, 238 P.2d 1132, 1134 (1951):
The right to the use of water, although a property right, is very different from the ownership of specific property which is subject to possession, control and use as the property owner sees fit. Such right does not involve the ownership of a specific body of water but is only a right to use a given amount of the transitory waters of a stream or water source for a specific time, place and purpose. . . .
(Emphasis added.) Accordingly, it is not sufficient to ask only who has title to water or in whose name a certificate of appropriation has been issued. The governing statute, Utah Code Ann. § 73-3-17, affords the certificate of appropriation only the status of "prima facie evidence of the owner's right to the use of the water." (Emphasis added.) Here it is undisputed that the right of use rests with Strawberry.

B. Ownership as a Protective Role
¶ 36 The State Engineer draws this court's attention to two decisions where entitlement to file change applications was tied to the holder of the certificate of appropriation. The two decisions are East Jordan Irrigation Co. v. Morgan, 860 P.2d 310 (Utah 1993), and Badger v. Brooklyn Canal Co., 922 P.2d 745 (Utah 1996). Each case illustrates the importance of asking not only the "title" or "ownership" question, but also the second question, which probes roots, purposes, and entitlements. East Jordan and Brooklyn Canal support the concept that a mutual water company as the owner of record of the collective rights of its shareholders is alone empowered to file change applications. But ownership for this purpose is not in derogation of the rights and entitlements of the shareholders who are the ultimate users, it is rather for their benefit. "The agreement between East Jordan and its shareholders imposes the duty on the association to manage its affairs in the interest of its shareholders as a whole." 860 P.2d at 314 (emphasis added). It is a form of ownership akin to that of a trustee. The court offered a succinct justification for the result reached:
We base this decision on the statutory scheme governing the appropriation of public waters, the principles of corporate law bearing on the function and power of boards of directors to manage corporate affairs in the interest of shareholders as a whole, and the dictates of sound public policy.
Id. at 312 (emphasis added); see also Syrett v. Tropic & East Fork Irrigation Co., 97 Utah 56, 89 P.2d 474 (1939) (holding that an irrigation company stands as a single appropriator with a duty to protect the rights of its stockholders).
¶ 37 Our holdings in East Jordan and Brooklyn Canal cannot be read as empowering the United States to emasculate rather than protect the rights of the ultimate beneficial users. Nothing in either decision will support an ownership status other than a protective role on behalf of the rank-and-file persons who have applied the water to beneficial use. In the final analysis, the principal thrust of East Jordan and Brooklyn Canal is not to undermine the importance of beneficial use, but rather to shift the protective focus from the individual shareholder to the shareholders as a collective whole.[10] The effort to use these decisions as a sword against, rather than as a shield in protection of, the collective whole of the individual users is completely untenable. The only way the *422 United States (or the State Engineer in behalf of the United States) could rely upon these cases would be to acknowledge that the United States stands in the same shoes worn by the mutual irrigation companies and that it holds title for the benefit of the ultimate users, and for no other purpose, a role it must share with the Strawberry Water Companies.
¶ 38 Casting the United States in a protective role for the benefit of the ultimate users is the approach embraced by the United States Supreme Court in Nevada v. United States, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). In that case, the Bureau of Reclamation sought to reduce the entitlement of irrigators to project water in order to provide additional water to an Indian tribe to whom the Department of the Interior owed a fiduciary duty. The Bureau claimed that as the title holder of the water rights it could alter the allocation of project water. In rejecting this position, the Supreme Court stated:
[T]he Government is completely mistaken if it believes the water rights confirmed to it ... were like so many bushels of wheat, to be bartered, sold, or shifted about as the Government might see fit. Once ... lands were acquired by settlers in the Project, the Government's "ownership" of the water rights was at most nominal; the beneficial interest in the rights confirmed to the Government resided in the owners of the land ... to which these rights became appurtenant upon application of the Project water to the land.
463 U.S. at 126, 103 S.Ct. 2906 (emphasis added). The Court chided the government for wholly ignoring "the [protective] obligations that necessarily devolve upon it from having mere title to water rights . . . when the beneficial ownership of these water rights resides elsewhere." Id. at 127, 103 S.Ct. 2906 (emphasis added).

C. Terminable Vis-a-Vis Permanent Right of Use
¶ 39 In his effort to support the position of the United States, the State Engineer also relies on this court's decision in Prisbrey v. Bloomington Water Co., 2003 UT 56, 82 P.3d 1119. Prisbrey involves a set of facts so completely foreign to the facts in this case that its only value is by way of contrast. In Prisbrey, the owner/lessor of a water right filed a change application at the request of its lessee. After the change application was duly noticed and granted by the State Engineer, a neighboring landowner (one Prisbrey) who had not filed a protest or participated in the administrative proceedings, filed a petition for judicial review. Among other rejected arguments, Prisbrey claimed that the published notice of the change application was invalid because it listed the owner/lessor of the water right rather than the lessee. Prisbrey argued that the lessee was the proper party to advance the change application under section 73-3-3(2)(a) because it was then using the water. The argument was rejected, first, for the reason that the lessee was not an appropriator under the law and, second, on the solid foundation that a lessee "owns only a terminable possessory interest in the water rights" and that "it would be illogical to permit [the lessee] to make a permanent change in the point of diversion, place of use, or purpose for use." Id. at 1124.
¶ 40 Prisbrey is not helpful to the position of the United States. To the contrary, we find it helpful to the position advanced by the Strawberry Water Users, who are not lessees with "terminable possessory interests." Rather, they were joint participants in the appropriation process and are the owners of the exclusive right to use the subject Project water in perpetuity. Though not clearly spelled out in Prisbrey, use and ownership were merged in that case. The owner/lessor filed the change application at the behest of the lessee. Use by the lessee would be deemed use by the lessor in that context. This court takes the opportunity to clarify that Prisbrey should not be read as undermining the importance of use as a basis for filing a change application under Utah's statutory scheme.

D. Authorization for Filing Change Applications
¶ 41 Permanent or temporary changes in the point of diversion or purpose *423 of use is governed by Utah law. Utah Code section 73-3-3 outlines a careful procedure for the filing and approval process. The qualification for filing relevant to our inquiry is stated as follows:
(2)(a) any person entitled to the use of water may make permanent or temporary changes in the:
(i) place of diversion;
(ii) place of use; or
(iii) purpose of use for which the water was originally appropriated.
Utah Code Ann. § 73-3-3(2)(a)(i)-(iii) (1989 & Supp.2005) (emphasis added).
¶ 42 As heretofore noted, East Jordan and Brooklyn Canal have construed this statutory provision in favor of a mutual irrigation company as opposed to an individual shareholder. Here the relationship is three-layered: the United States, the Strawberry companies, and the shareholders. The Strawberry companies represent the collective use of all their shareholders. They owe these shareholders a fiduciary duty and have a responsibility to manage for the common good. The concern in East Jordan and Brooklyn Canal that one shareholder would pursue a course at variance with the interests of the other shareholders is nonexistent in this case. The risk here is that the United States as holder of the certificate would seek to pursue a course at variance with the Strawberry companies and their shareholders, whose interests are aligned. Such a course would be contrary to the cited decisions and to the protective role recognized in Nevada, 463 U.S. at 126-27, 103 S.Ct. 2906.
¶ 43 The considerations in East Jordan and Brooklyn Canal which led to the decisions favoring the mutual irrigation companies do not favor the United States. These same considerations favor continued recognition of the right of the mutual irrigation companies to make change application decisions for the benefit of the collective whole of the shareholders whom they represent and who, through their votes, control the boards of directors. The United States, on the other hand, is a stranger to the day-by-day beneficial use and lacks a direct equation with the actual users. Moreover, even if the United States were entitled to file the applications, it could not do so in derogation of the rights and entitlements of the ultimate users in whose interest it is obliged to act. Failure to protect this interest would violate the principles established in Nevada.[11]
¶ 44 Having corrected the misreading of our statutory and case law regarding "ownership" and the filing of change applications, we turn now to the claim that provisions in the contract(s) between these parties require the Secretary of the Interior's approval of any change in place or purpose of use.

V. DEFERRAL TO FEDERAL DISTRICT COURT
¶ 45 In its federal court counterclaim, the United States advances the position that "[t]he federal government retains the ultimate approval authority with respect to both the distribution of project water and any change of place or purpose of use that might be contemplated." It claims that this is mandated both by the contract between the parties and by federal statutes. It further claims that as the "title owner of record" it alone has the authority to file a change application with the State Engineer.
¶ 46 We have addressed the latter argument, but must now defer to the federal court for construction of the federal statutes as well as the contracts between the parties. We note, however, that the position advanced by the United States seriously calls into question the primacy of state water law guaranteed by Section 8 of the Reclamation Act. *424 Notwithstanding the over-arching importance of this issue, any further response by Utah courts must await the federal court review.
¶ 47 We also take note of the claim by the United States that if Strawberry is allowed to change the place or purpose of use of Project water without Secretary approval, it will threaten the "integrity" and "viability" of the entire Project as well as the Central Utah Project. Such a claim, if adequately supported, would be extremely compelling in either federal or state court or before the Utah State Engineer, whose responsibility it is to evaluate change applications. The threat posed by irrigating lawns and gardens and other small tracts whose combined consumptive use does not exceed that of the larger tract of which they are a part is not apparent to us, but could be readily evaluated by the State Engineer. The right to file change applications neither ends the inquiry nor guarantees approval. Each change application must stand on its own merit. Quite clearly, any real compromise of the ability of the Project to survive or properly function would give great pause to any responsible official or tribunal.

VI. THE CLAIMS TO RETURN FLOW FROM IMPORTED WATER
¶ 48 We come at last to the competing claims to return flow water. This does not appear to be a change application issue, but a dispute about which party, if either, can extend control beyond the initial use made by Strawberry. It ventures into uncharted territory. The ambitious applications to, in essence, reappropriate Project water give rise to three interrelated questions that we discuss not for the purpose of resolution, but for the purpose of examining the jurisdiction in which they ultimately should be decided. The three questions may be stated as follows: First, can either party follow Project water beyond the current user's (Strawberry's) reach and then subsequently recapture it? Second, can the United States, enjoying no right of use to the Project water in Utah Valley, gain a superior right to the use of that water once it becomes return flow? And third, does the inquiry necessarily move beyond these parties, thereby implicating matters suitable for a general adjudication?
¶ 49 These questions are complicated by the fact that they arise in the context of water imported to the Great Basin from the Colorado River drainage. This importation augments the supply of water available for beneficial use in both Utah Valley and the Salt Lake Valley. In the absence of reliance on this fact and the apparent cooperation of the State Engineer,[12] it is difficult to understand how these parties could seek to recapture virtually the entire quantity, in acre-feet, of the imported water.

A. Recapturing Return Flow
¶ 50 Under ordinary circumstances, the original appropriator can use and reuse the water so long as it is within the appropriator's control. Estate of Steed v. New Escalante Irrigation Co., 846 P.2d 1223, 1225 (Utah 1992). But once the water has passed to the land of another and out of the control of the user, it is subject to recapture and appropriation by others. Smithfield W. Bench Irrigation Co. v. Union Cent. Life Ins. Co., 105 Utah 468, 142 P.2d 866, 868 (1943). The law "makes no distinction between previously appropriated waste waters which are beyond the control of the original appropriator and the flow of natural streams, and under [the statutory provisions] all ... are subject to appropriation." McNaughton v. Eaton, 121 Utah 394, 242 P.2d 570, 574 (1952). Further:
Water permitted to escape after it has been appropriated by one, and which finds its way into the natural channel of a stream from which it was taken or into the channel of another stream cannot be reclaimed by the original appropriator against subsequent appropriators (users) who have made use of it.
*425 Wrathall v. Johnson, 86 Utah 50, 40 P.2d 755, 766 (1935) (citation omitted) (emphasis added). These principles were specifically applied to return flow water in the underground basin in the case of Stubbs v. Ercanbrack, 13 Utah 2d 45, 368 P.2d 461, 464 (1962), to wit:
But after the irrigation water is used and becomes commingled with the waters in the natural water table it has lost its identity as irrigation water and is no longer owned by the [irrigators] as such. Such waters in the natural water table are and always have been subject to appropriation.
(Emphasis added.) It seems elementary that Utah courts must determine how these well-established principles should be applied to imported water.

B. Right to Recapture Without Prior Right of Use
¶ 51 The United States has not applied the water to the land covered by the certificates of appropriation. The general rule in the western states that beneficial use is the basis, the measure, and the limit of the right to use water for irrigation is given expression in the Reclamation Act. Imperial Water Co. No. 5 v. Holabird, 197 F. 4, 12 (9th Cir.1912). The language of the Act provides: "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372 (2005). The certificates of appropriation stand in the name of the United States; however, in the absence of beneficial use by the Strawberry Water Users, these would be nothing more than empty vessels. Moreover, under the terms of the Act as well as the patents issued, the water rights are appurtenant to the lands described in the certificates. These lands have been owned and occupied by the Strawberry Water Users at all relevant times.
¶ 52 By some yet unarticulated theory, the United States seeks to recapture the return flow from water beneficially used by the Strawberry Water Users on their lands, the United States being a complete stranger to both the lands and the water since delivery of the latter to these users at a far distant point high in the watershed. Presumably, the United States places complete reliance upon the assumption that imported water should be afforded special treatment unlike all other water belonging to the public and that it, as opposed to the Strawberry Water Users, should be the beneficiary of that special treatment. Quite clearly, this involves major policy issues "relating to the control, appropriation, use or distribution of water" and is therefore governed by state water law under the express language of Section 8 of the Reclamation Act. 43 U.S.C. § 383 (2005) (emphasis added). Utah courts will have to grapple with these issues.

C. Addressing the Issues in a General Adjudication
¶ 53 Under the McCarran Amendment, the United States is subject to Utah's general adjudication statute. It is codified at Utah Code Ann. §§ 73-4-1 through -24 (2004). The Act provides for the general adjudication of the rights of various claimants to the waters of a particular stream or water source. The final section of the Act, § 73-4-24 (hereafter "Section 24"), provides in relevant part as follows:
If, during the pendency of a general adjudication suit, there shall be a dispute involving the water rights of less than all of the parties to such suit, any interested party may petition the district court in which the general adjudication suit is pending to hear and determine said dispute. . . . Thereafter the court may hear and determine the dispute and may enter an interlocutory order to control the rights of the parties . . . until the final decree in the general adjudication suit is entered.
¶ 54 The United States argues that this is purely a "private dispute" and therefore not properly part of a general adjudication to which the United States has waived sovereign immunity. It relies on Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), for the proposition that the only actions that can be considered as seeking an "adjudication of rights to the use of water of a river system or other source" under the McCarran Amendment are those "involving a general adjudication of all of the rights of *426 various owners on a given stream." Id. at 618, 83 S.Ct. 999 (internal quotations omitted).
¶ 55 We find no violation of the principles stated in Dugan, which arose in a much different context than is present here.[13] Section 24 authorizes this court to "hear and determine" the dispute of these parties as part of the "general adjudication suit." Section 24 represents a simple and commonsense recognition that there may be some disputes involving the water rights of fewer than all of the parties in a water basin, thereby justifying an early hearing and entry of an interlocutory decree short of the final decree in the general adjudication. This serves the "objective of providing . . . a reasonably prompt resolution of the issues raised in [the] section 24 petition." Murdock v. Springville Mun. Corp., 878 P.2d 1147, 1150 (Utah 1994). This objective is a key factor favoring exercise of discretion to allow the action to proceed. Id.
¶ 56 The United States Supreme Court has approved an adjudication process somewhat similar to that contemplated by Section 24. See United States v. Dist. Court in and for Water Dist. No. 5, 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971); United States v. Dist. Court in and for the County of Eagle, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971). In these decisions, the Supreme Court upheld the McCarran Amendment waiver of immunity even though the adjudication process proceeded step by step and, at times, focused only on the water rights of particular claimants. Such a process, which eventually involves the entire community of claims, is quite essential for such a massive undertaking.
¶ 57 The State Engineer also points out that a general adjudication should not be employed to resolve a purely "private dispute" even if water rights are involved. The concept is sound, but the examples given and the cases cited are not akin to the facts and circumstances of this case. To suggest that this is a private dispute whose impact begins and ends with these parties is to turn a blind eye to the obvious. It potentially reverberates all the way from southern Utah Valley north to where the Jordan River enters the Great Salt Lake.[14] If the imported water is protected from appropriation by others even after its identity has been lost and it is commingled with other waters in the underground basin or in natural water courses or bodies, then what is to prevent the present effort from being repeated until the water is either lost to evaporation or moves beyond the possibility of recapture? The competitive applications filed by these parties are very ambitious. Of the 61,000 acre-feet which it guarantees to deliver annually to the Strawberry Water Companies, the United States proposes to recapture 49,200 acre-feet for storage in Utah Lake and use in Salt Lake County.[15] The Strawberry Water Companies propose to recapture all return flow from 64,400 acre-feet for use in southern Utah Valley.
¶ 58 It is universally understood that the public waters of this state are appropriated and used high in the various watersheds only to become return flow for appropriations anew over and over again until the residue finally passes beyond any possible diversion for beneficial use. It is all the same water. In the absence of special treatment for imported water, the claims of these parties seem difficult to defend. Whether or to what extent imported water is entitled to different treatment does not appear to have been squarely addressed by this court. It surfaced in an oblique manner in Tanner v. Bacon, 103 Utah 494, 136 P.2d 957 (1943), to *427 which the State Engineer has softly drawn our attention. As here, Tanner dealt, at least in part, with water developed pursuant to a reclamation project (Deer Creek Project); but the United States and the Provo River Water Users' Association (who stood in the same position as the Strawberry Water Users stand here) were on the same side. Both opposed the application of the plaintiff to appropriate waters of the Provo River for power generation purposes. In this context, the plaintiff made a concession in relation to the imported water:
[The plaintiff] concedes that he can acquire no rights under his application to the use of the waters which may be brought from the Weber and Duchesne river systems. Such waters having been appropriated and reduced to possession and ceased to be public waters and are not subject to appropriation.
136 P.2d at 960.
¶ 59 Neither the district court nor this court reinforced the distinction drawn or the concession made by the plaintiff. Rather they held that the plaintiff's approved application was subordinate and inferior to the "prior rights" of the United States and the Provo River Water Users' Association in "the waters of the Provo River and its tributaries, and the waters of the Weber and Duchesne rivers and their tributaries in connection with the Deer Creek reclamation project." Id. at 961. In the sixty-plus years since it was decided, there are no subsequent cases which cite Tanner for the proposition that imported water is entitled to special treatment. That is a subject that will deserve full briefing and careful consideration at the appropriate time, which is not now. The sole purpose in citing and briefly discussing Tanner is to reveal that an effort to afford different treatment for imported water is not entirely novel, that it potentially involves rights and interests on a much broader scale than the interests of these litigants, and that it necessarily implicates fundamental issues of Utah water law properly addressed to Utah courts in the context of a general adjudication.

VII. EIGHTH DISTRICT COURT PROCEEDING
¶ 60 It is clear that the United States is a party to the general adjudication action in the Third District Court pending since 1936. There is a dispute as to whether it is a party in the Eighth District. This may be of limited consequence since there is no dispute between these parties about the diversion and use of water within the Uintah Basin drainage. They are in agreement that the waters in question have been properly diverted and captured in the Strawberry Reservoir and properly delivered through the diversion tunnel into the Utah Lake-Jordan River drainage for beneficial use by the Strawberry Water Companies and their shareholders. The basic diversion decision was made some 100 years ago and will remain entirely unchanged by the outcome of the current dispute. All impacts and implications of this dispute appear to be limited to the Utah Lake-Jordan River drainage. The State Engineer has issued a memorandum decision giving conditional approval of applications for both parties subject to a judicial determination establishing who has the right to proceed with such applications. There is no apparent reason to suppose that the resolution of this dispute in the Third District action will have any impact on the general adjudication in the Uintah Basin.

CONCLUSION
¶ 61 Jurisdiction rests in the federal district court to "adjudicate, confirm, validate or decree . . . contractual rights." 43 U.S.C. § 390uu. Jurisdiction rests in state district court as to issues dealing with the "control, appropriation, use or distribution of water," 43 U.S.C. § 383 (emphasis added), and "adjudication of the right to use of water of a river system." 43 U.S.C. § 666 (emphasis added). The United States has consented to joinder in both courts. In Utah, "ownership" of water rights is equated with "right of use," and title can be held in a protective capacity for those who have that right. The water rights dispute of these parties is appropriate for resolution under Utah's general adjudication statute of which Section 24 is an integral part. It has been properly invoked by the Strawberry Water Users. This is not just a "private dispute," but potentially impacts *428 many downstream appropriators and involves important water law issues of first impression. The dispute centers in the Utah Lake-Jordan River drainage.
¶ 62 We remand to Eighth District Court, directing that it stay further proceedings pending the outcome in Third District Court and in federal district court. We remand to Third District Court for further proceedings consistent with this opinion. The parties need to evaluate what questions they want answered in light of our ruling and to press those issues in the proper jurisdiction. If the parties dispute the manner in which the contracts between them should be construed, and their rights thereunder, then Third District Court is directed to defer to federal district court. Once the contractual provisions are made clear, Third District Court should determine the manner in which they should be recognized, treated, or applied under Utah water law. We further direct Third District Court to work in a cooperative manner with federal district court so as to facilitate each court hearing and resolving the matters which are peculiarly within its jurisdictional province.
¶ 63 Chief Justice DURHAM and Justice NEHRING concur in Judge McIFF's opinion.
¶ 64 Having disqualified herself, Justice PARRISH does not participate herein; District Judge K.L. McIFF sat.
DURRANT, Justice, concurring and dissenting:
¶ 65 I fully concur in all aspects of the majority opinion, except for the section entitled "The Claims to Return Flow from Imported Water." As to that section, I concur in part and dissent in part.
¶ 66 I agree with the majority that the return flow issue is governed by state law and is appropriately resolved by state courts. See supra ¶¶ 50, 52, 59. I am unwilling, however, to join with the majority in anticipating how the issue will ultimately be resolved by this court.
¶ 67 I recognize that the majority does not purport to resolve the parties' return flow claims, but rather, provides analytical guidance. That guidance is, however, at a minimum, suggestive of what this court's ultimate resolution of the claims would be. This is a step I am unwilling to take at this juncture.
¶ 68 My unwillingness is founded not upon any disagreement with the substance of the guidance provided by the majority, but upon the fact that the parties' return flow claims are not now before us, and we have therefore not had the benefit of full briefing on the issues raised by these claims. I would wait until the return flow issue is squarely before this court and has been appropriately briefed before attempting to determine how it should be resolved.
¶ 69 Associate Chief Justice WILKINS concurs in Justice DURRANT's concurring and dissenting opinion.
NOTES
[1] "Strawberry Water Users" includes the Strawberry Water Users Association and the Strawberry Highline Canal Company. Occasional reference may also be made to "Strawberry" or to the "Association." These are intended to include the water companies and/or all shareholders.
[2] "Strawberry Valley Project" may be referred to as "SVP" or simply as the "Project." Reference is also made to "Project water."
[3] Case No. XXXXXXXXX. The action began as a private suit, but was converted to a general adjudication by this court in 1944. Salt Lake City v. Anderson, 106 Utah 350, 148 P.2d 346, 349 (1944).
[4] Case No. XXXXXXXXX.
[5] Case No. 2:01CV00295 J. On September 21, 2001, the Strawberry Water Users filed an additional action in the District Court in Duchesne County, joining the United States as a defendant (Case No. XXXXXXXXX AA, styled Strawberry Water Users Association v. Robert L. Morgan). This latter action was removed to the federal court (Case No. 2:02CV0034 J.), where it was subsequently consolidated with the other federal court action because it probed several of the same basic legal issues.
[6] With minor adjustments, we here embrace a narrative set forth in Strawberry's opening brief. It tells the story in an understandable and useful manner with appropriate reliance upon historical facts extracted from various federal decisions at all levels, including the United States Supreme Court.
[7] The factual narrative relating to the Strawberry Valley Project is taken essentially from the allegations of petitioners' complaint, which was dismissed by both the Third and Eighth District Courts. These allegations must be deemed true, and this court must consider all reasonable inferences to be drawn therefrom in a light most favorable to Strawberry. Peterson v. Delta Airlines, Inc., 2002 UT App 56, ¶ 2, 42 P.3d 1253; Prows v. State, 822 P.2d 764, 766 (Utah 1991). Where noted, we also rely to a limited extent on factual allegations set forth by the United States in its answer and counterclaim filed in the federal court and attached as an addendum to its brief. We have found the latter necessary in order to flesh out what appears to be at stake in this litigation and the proper forum for adjudication.
[8] Between 1910 and 1934, the United States filed five additional applications to appropriate water and eventually obtained certificates of appropriation. As to each one, the proof of appropriation filed with the State Engineer was based upon beneficial use by Strawberry Water Users and/or other Project water users. As to these five applications, the certificates of appropriation were also issued in the name of the United States for the use in perpetuity by Strawberry or other Project water users. Some of these are for irrigation, some for electrical generation. Only one, Certificate of Appropriation No. 2116 (later designated as water right No. 43-3102), involves major acre-footage. The certificate is for 60,000 acre-feet for use on the same 53,522.24 acres located in southern Utah County that is the subject of Application No. 79.
[9] These facts and those which follow have been gleaned from the Strawberry petitions filed in the Third and Eighth District Courts and the counterclaim filed by the United States in the federal district court. There does not appear to be a dispute about these facts, only about the legal consequences flowing therefrom. It is not possible to understand the dispute of these parties and what is really at stake in this litigation or to properly analyze the jurisdictional issues without inclusion of these facts.
[10] East Jordan prompted a strong dissent in favor of individual users. The majority adopted a pragmatic approach that places the administrative and management burden on the water company while mandating protection of all users. Specifically, East Jordan recognizes the right of an individual shareholder to judicially challenge the "appropriateness of board policy regarding change applications and the regulation of the shareholder's rights." 860 P.2d at 316. Brooklyn Canal and Syrett are in accord. Moreover, the legislature has now adopted a statutory procedure governing change applications sought by individual shareholders. See Utah Code Ann. § 73-3-3.5.
[11] We do not foreclose the possibility that in the proper circumstance the United States should be allowed to file the change application. In addition to "entitlement to the use of water" as a qualifying basis, Utah's statute empowers the holder of an "approved application for the appropriation of water" to file. Utah Code Ann. § 73-3-3(8)(a). Here the "approved application" matured into a "certificate of appropriation," but the right of use became separated from the holder of the certificate. The statute does not have a separate provision for the holder of the certificate. We need not determine how these provisions should be applied to the United States in its role in this case since it is only the right to file belonging to the actual users (Strawberry) that has been challenged.
[12] Without any discussion or analysis, and in a rather obscure manner, the State Engineer seems to accept the notion that imported water can never be subject to appropriation by others in the import basin, citing Tanner v. Bacon, 103 Utah 494, 136 P.2d 957 (1943). The Tanner decision is briefly discussed hereafter. See infra ¶ 58.
[13] Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), involved an action for injunctive relief to prevent the United States from impoundment of water that allegedly interfered with the rights of downstream users. The court determined that it was a private dispute potentially involving a partial taking of water rights giving rise to claims for compensation.
[14] There may be some motivation for these parties to characterize this as a "private dispute," thereby eliminating all outside competition for return flow from imported water. The issues and impacts are simply too expansive to allow this.
[15] This acknowledges a loss of some 19.4% of the acre-footage. If the pattern persisted, the next round would begin at approximately 39,680 acre-feet. The Strawberry Water Companies do not address the issue of loss.