**F I L E D**

**PUBLISH**

**OCT 25 2001**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

| | |
|---|---|
| ELEPHANT BUTTE IRRIGATION DISTRICT OF NEW MEXICO; EL PASO COUNTY WATER IMPROVEMENT DISTRICT NO. 1 OF TEXAS, <br><br>     Plaintiff-Appellees and Cross-Appellants, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR; GALE A. NORTON,[*] Secretary of the Interior; JOHN W. KEYS, III, Commissioner of Reclamation; RICK L. GOLD, Regional Director of Reclamation, <br><br>     Defendants-Appellants and Cross-Appellees. | Nos. 99-2291, 99-2295 |

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-90-95-HB)

Kathryn E. Kovacs, Attorney, United States Department of Justice, Washington, D.C. (John W. Zavitz, Assistant U.S. Attorney, Albuquerque, New Mexico, Chris

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Gale A. Norton, John W. Keys, III, and Rick L. Gold are substituted as appellants in this action.

Rich, Attorney, U.S. Department of the Interior, Salt Lake City, Utah, Lois Schiffer, Assistant Attorney General, Peter Coppelman, Acting Assistant Attorney General, John A. Bryson and R. Lee Leininger, Attorneys, United States Department of Justice, Washington, D.C., with her on the briefs), for Defendants-Appellants and Cross-Appellees.

Herman E. Ortiz and Lee Peters, of Hubert & Hernandez, P.A., Las Cruces, New Mexico (James M. Speer, Jr., El Paso, Texas, with them on the briefs), for Plaintiffs-Appellees and Cross-Appellants.

---

Before **SEYMOUR**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **JENKINS**, Senior District Judge.[**]

---

**SEYMOUR**, Circuit Judge.

---

[**]The Honorable Bruce S. Jenkins, United States Senior District Judge for the District of Utah, sitting by designation.

The United States Department of the Interior and various federal officials (DOI), appeal the district court's grant of summary judgment to plaintiffs Elephant Butte Irrigation District of New Mexico and El Paso County Water Improvement District No. 1 of Texas (the water districts) on Count I of the water districts' complaint. The water districts cross-appeal the grant of summary judgment to DOI on Count VI of the complaint. For the reasons explained below, we affirm.

**I.**

The operative facts of this case date back to the early twentieth century. The two projects involved in this litigation are the El Paso and Elephant Butte Irrigation Districts, both of which are part of the Rio Grande Valley irrigation project. That project was part of a national drive to irrigate arid western lands during the late nineteenth and early twentieth centuries. Much of the early irrigation work was originally undertaken by private entities. In 1902, the federal government became involved when Congress passed the Reclamation Act, which created a general reclamation fund for the federal financing of these large-scale irrigation projects under the auspices of the DOI. *See* 43 U.S.C. §§ 371-600 (1994). At its inception, the reclamation fund was to be made up entirely of money received from the sale of public lands. The fund would then make loans to

local water districts to finance the construction costs of irrigation projects. After construction was complete, the water districts were to reimburse the fund for the construction loans over a period of ten years.

The agricultural depression of the 1920s made Congress's original plan for the operation of the reclamation fund unworkable. Many of the water districts were unable to make payments to the fund on their construction loans because of the depression, causing widespread default. Moreover, the sale of public lands had slowed so much by the 1920s that it became impractical to make such sales the sole basis for the fund. Congress first attempted to remedy the situation by extending the water districts' term of repayment from ten to forty years. However, this worsened the problem by reducing even further the amount of cash going into the fund, and the fund became completely insolvent because it could not revolve quickly enough.

Unsure what to do about the situation, Congress commissioned a fact finders' report to assess ways to address the circumstances facing the government, the water districts, and the reclamation fund. The report recommended that once the majority of construction costs had been repaid by the water districts, the districts should be required to take over from the government the operation and maintenance of the projects. In exchange, the water districts would be able to retain certain of the profits garnered by the irrigation projects rather than having

to return all profits to the reclamation fund. The goal was to make both the water districts and the reclamation fund solvent.

Based upon the recommendations contained in that report, Congress amended the Reclamation Act in 1924 by adding, inter alia, a new provision, known as Section 4-I, which stated as follows:

> Whenever the water users take over the care, operation, and maintenance of a project, or a division of a project, the total accumulated net profits, as determined by the Secretary, derived from the operation of project power plants, leasing of project grazing and farm lands, and the sale or use of town sites shall be credited to the construction charge of the project, or a division thereof, and thereafter the net profits from such sources may be used by the water users to be credited annually, first, on account of project construction charge, second, on account of project operation and maintenance charge, and third, as the water users may direct. No distribution to individual water users shall be made out of any such profits before all obligations to the Government shall have been fully paid.

43 U.S.C. § 501 (1994) (Section 4-I). Section 4-I provided for what is called "front end" crediting, under which the water districts would first apply profits to their annual repayment obligations, then to their annual operation and maintenance charges, and finally as the water users decided. This method had the effect of reducing the districts' next payment.[1]

_____

[1]"Front end" crediting is different from "tail end" crediting, which forces a debtor to apply profits first to the principal owed and second to the annual repayment obligation. *See* Aplt. Br. at 6. "Tail end" crediting reduces the

(continued...)

As the economic depression worsened, Congress provided still more assistance to water districts in 1926 through a statute authorizing the Secretary of the Interior "to grant the relief provided for in [Section 4-I] to any of the projects mentioned in this Act, without requiring such project to take over the care, operation, and maintenance of the project works." Omnibus Adjustment Act of 1926, ch. 383, Pub. L. No. 69-284, 44 Stat. 636, 649 § 45. The water districts would thus be absolved of their responsibilities under Section 4-I and would be able to derive some profits from the project lands, which they could use to pay the reclamation fund. The Act also removed the repayment obligations of the water districts with respect to any land in their project that had proved to be non-irrigable.

In 1937, Congress enacted a law authorizing the Secretary of the Interior to contract with the water districts for the purpose of terminating their leases of power privilege. *See* Interior Department Appropriations Act of 1938, ch. 570, Pub. L. No. 75-249, 50 Stat. 564, 593. Leases of power privilege had previously been granted by the Secretary to the water districts pursuant to an earlier Act of Congress. In these leases, the federal government gave the water districts the right to build power facilities and to use the proceeds from those facilities to

---

[1](...continued)
principal but not the next payment. *Id.*

repay their construction obligations. However, the water districts never executed their rights to build power facilities on water project lands. The 1937 Act was designed to return to the federal government the right to build power facilities while giving the water districts a distinct benefit: relief from the obligation to repay their outstanding construction costs. Both El Paso and the Elephant Butte Irrigation District entered into contracts with the Secretary of the Interior in accordance with the 1937 Act.

Despite these various attempts by Congress to save the reclamation fund, it was still in dire financial straits in 1939. Consequently, Congress enacted 43 U.S.C. § 392a, known as the Hayden-O'Mahoney Amendment to the Interior Department Appropriations Act of 1939 (the Amendment or Hayden-O'Mahoney). The Amendment provided:

> All moneys received by the United States in connection with any irrigation projects, including the incidental power features thereof, constructed by the Secretary of the Interior through the Bureau of Reclamation, and financed in whole or in part with moneys heretofore or hereafter appropriated or allocated therefor by the Federal Government, shall be covered into the reclamation fund, except in cases where provision has been made by law or contract for the use of such revenues for the benefit of users of water from such project: *Provided*, That after the net revenues derived from the sale of power developed in connection with any of said projects shall have repaid those construction costs of such project allocated to power to be repaid by power revenues therefrom and shall no longer be required to meet the contractual obligations of the United States, then said net revenues derived from the sale of power developed in connection with such project shall, after the close of each fiscal year, be transferred to and covered into the General Treasury as "miscellaneous receipts . . . ."

43 U.S.C. § 392a (1994). The Amendment was designed to increase the reclamation fund by depositing into it any money made by federal power facilities. To that end, the Amendment repealed the earlier right to profits from any power facilities granted to the water districts by Section 4-I. However, the Amendment contained a savings clause protecting the receipt by water districts of revenues provided for under preexisting contracts or other laws.

In 1979 and 1980, the water districts took over the operation and maintenance of their irrigation facilities. In January 1990, the complaint in this action was filed by the water districts against the federal government. In Count I, the districts contended they were owed revenues granted to them by Congress in Section 4-I. They asserted that these revenues were owed them notwithstanding the subsequent enactment of Hayden-O'Mahoney, which they alleged did not repeal Section 4-I. The government countered that Hayden-O'Mahoney did in fact repeal Section 4-I in its entirety. The districts also asserted three other counts: Count II, challenging the Bureau of Reclamation's lease of lands; Count III, challenging the Bureau's transfer of stored water; and Count IV, challenging the imposition of operation and maintenance charges by the Bureau.

In a September 1992 order, the district court granted summary judgment to the water districts on Count I. In October 1993, the water districts filed an amended complaint which added two additional counts. Count V sought the

immediate transfer of title to project irrigation works to the water districts. Count VI sought termination of the current memorandum of understanding between the Bureau of Land Management and the Bureau of Reclamation concerning the management of project lands on which grazing leases had been granted.

In October 1996, the water districts and the DOI entered into a stipulation in which they agreed upon the amount of the Section 4-I net profits. The districts dismissed Count IV with prejudice and the Bureau of Reclamation forgave the districts' operation and maintenance deficit charges for three years. In a separate stipulation, the parties dismissed Count III.

Following cross-motions for summary judgment on Count II and the DOI's motion for summary judgment on Counts V and VI, the district court issued an order in April 1997 that addressed these three remaining claims. The court denied summary judgment on Count II, finding that a material factual issue was in dispute. The court granted the DOI's motion for summary judgment on Counts V and VI. A motion for clarification was filed by the water districts on April 23, 1997, and the court issued a clarification on June 24, 1999. A Rule 54(b) order was entered in the case on July 20, 1999, to permit this appeal.

On appeal, the DOI challenges the district court's decision with regard to Count I. The water districts cross-appeal the district court's resolution of Count VI.

## II.

We review a grant of summary judgment de novo, applying the same legal standard used by the district court. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms*, 165 F.3d at 1326.

### *Count I*

The district court ruled as a matter of law that Hayden-O'Mahoney did not repeal Section 4-I in its entirety. The government challenges that determination, contending the Amendment terminated all of the water districts' rights to revenues arising under Section 4-I except for those revenues covered by the savings clause of the Amendment, i.e., those revenues to which water districts had a preexisting legal or contractual right.[2]

---

[2] The government also argued below that the court was required to defer to the Bureau of Reclamation's interpretation of the reclamation laws. The court declined to do so, observing that "the agency has not interpreted the statutes in relation to plaintiffs' entitlement to [Section 4-1] revenues in any reasonably

<span style="float:right">(continued...)</span>

As the district court correctly noted, "'the repeal of a statute by implication is not favored.'" App. vol. II, at 301 (quoting *Yellowfish v. City of Stillwater*, 691 F.2d 926, 928 (10th Cir. 1982)).  Any repeal by implication requires that "the intention of the legislature to repeal must be clear and manifest." *Posadas v. National City Bank of New York*, 296 U.S. 497, 503 (1936).  Repeal by implication may be found in only two situations: "(1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act." *Plains Elec. Generation & Transmission Coop., Inc. v. Pueblo of Laguna*, 542 F.2d 1375, 1376 (10th Cir. 1976) (quoting *Posadas*, 296 U.S. at 503).

The district court examined the two statutes at issue, found two obvious conflicts between them, and held that "Hayden-O'Mahoney is a repeal or modification to the extent of those conflicts." App. vol. II, at 302.  The first of these modifications, under the district court's analysis, provided that once the

---

[2](...continued)
consistent manner prior to the instigation of the lawsuit." App. vol. II, at 308. Although the government again asserts this argument pro forma on appeal, it offers no argument or authority specifically controverting the district court's conclusion or the evidence upon which that conclusion was based.  Accordingly, we affirm the district court's determination that deference is not appropriate here.

water districts repaid their construction cost obligations for power facilities, "net revenues thereafter derived from the sale of power were no longer to remain in the reclamation fund to be credited to the project under [Section 4-I], but would be deposited into the General Treasury." *Id.* Second, "Hayden-O'Mahoney also removes the possibility, implied in the final sentence of [Section 4-I], that once the water users had paid off all their obligations . . . net profits could be distributed to the water users directly." *Id.* The court concluded that "nothing in Hayden-O'Mahoney 'clearly and manifestly' changes other [Section 4-I] provisions" regarding the way in which other net revenues were to be credited to the water districts. *Id.* at 302-03.

After analyzing the plain language of the statute, the district court extensively assessed the legislative history behind Hayden-O'Mahoney. The court cited several letters from the Secretary of the Interior explaining the proposed legislation, which were published in the Congressional Record. *See id.* at 303-06. These letters demonstrate that the purpose behind Hayden-O'Mahoney was the bolstering of the reclamation fund, "perhaps at the expense of the General Treasury, but not at the expense of the water users, except with regard to power revenues." *Id.* at 305 (footnote omitted).

We agree with the district court's analysis of this issue. The plain language of the statute does not purport to repeal Section 4-I. The legislative history

demonstrates that the congressional intent behind Hayden-O'Mahoney was merely to deposit power revenues into the fund and then the general treasury, rather than to recapture all the profits to which the water districts were entitled under Section 4-I. Hayden-O'Mahoney does not mention the two other sources of revenue in Section 4-I: the leasing of project grazing and farm land, and the sale or use of town sites. Furthermore, even if we assume the wording of Hayden-O'Mahoney is confusing, that fact would cut against finding repeal by implication, which must be *clear and manifest. Posadas*, 296 U.S. at 503.

We further agree with the district court's analysis of the scope of the modifications made to Section 4-I by Hayden-O'Mahoney. First, the Amendment directed that funds derived from the sale of power ultimately become part of the general treasury and not the reclamation fund. Second, the Amendment directly repealed Section 4-I with regard to the distribution of profits to the water districts.[3]

Finally, the government takes issue with the district court's ruling that if

---

[3]We note that our holding today is in direct conflict with the holding of the Ninth Circuit in *Fort Belknap Irrigation Dist. v. Bureau of Reclamation*, No. 99-35615, 2000 WL 1868213 (9th Cir. Dec. 20, 2000), which was decided while this appeal was pending. However, the Ninth Circuit's opinion was unpublished and provided little analysis in support of its holding. As an unpublished opinion, it has no precedential value under the rules of that circuit, except as it relates to the doctrines of the law of the case, collateral estoppel, and res judicata. 9th Cir. R. 36-3(a).

the water districts are entitled to credits under Section 4-I, they are entitled to

credits from the entire Rio Grande Project.  The government argues that the 1937

contracts between it and the water districts divided the Rio Grande Project into

two "divisions": the storage division and the irrigation and drainage division, and

that the water districts are therefore entitled at most to credits from the irrigation

portion of the project.  The district court held that the 1937 contracts did not

divide the project for any purpose but that of operation and maintenance.  In fact,

the 1937 contracts use only the word "system," not the word "division."  We

agree "[t]here is no indication that the drafters of [Section 4-I] contemplated a

project would be divided for purposes of operation and maintenance as the Rio

Grande Project was divided in the 1937 contracts."  App. vol. II, at 314.  We

accordingly affirm the ruling of the district court as to Count I.[4]

### Count VI

In their amended complaint the water districts added Count VI, which

challenged the validity of the lease agreement between the Bureau of Reclamation

---

[4]The district court, after ruling that Hayden-O'Mahoney was not a complete repeal by implication of Section 4-I, went on to discuss the effect of the 1937 contracts between the water districts and the federal government in light of the savings clause found in Hayden-O'Mahoney. App. vol. II, at 306-07.  Because we affirm the district court's ruling on the repeal-by-implication issue, we need not decide whether the 1937 contracts fit within the savings clause, since, as the district court noted, that issue is "immaterial" if there was no repeal of Section 4-I. *Id.*

(BOR) and the Bureau of Land Management (BLM) for management of grazing lands within the water districts.[5]  App. vol. II, at 320-21.  The water districts challenged the lease as "not in the best interests of the Project beneficiaries" since the lease arrangement provided "no consideration" to them.  *Id.* at 321.  The districts noted that "prior to the leasing agreement . . . the Plaintiffs received credits for the leasing of grazing lands . . . .  The Plaintiffs have now been notified that they will no longer receive such credits as a result of the management practices" of the DOI.  *Id.*

In support of their position, the water districts asserted that the DOI had a fiduciary duty to them and that this duty required the DOI to manage the grazing lands "on a sound, operative and business basis."  *Id.*  The water districts contended that the current lease of grazing lands between the BOR and the BLM violated this fiduciary duty since it did not maximize profits to be credited to the water districts.  *Id.*  As a remedy, the water districts sought to have the current memorandum of understanding between the BOR and the BLM terminated.  *Id.* at 322.

The DOI responded that "Congress has plenary authority over the management of the federal lands under its constitutional authority" and that Congress had granted authority to both the BLM and the BOR "to enter into land

---

[5]The BOR and the BLM are both agencies of the DOI.

management agreements." *Id.* at 329. The district court agreed with the government, holding that no fiduciary duty was owed the water districts by the federal government, that the DOI had no obligation to generate profits for the water districts, and that the authority of the Secretary of the Interior to administer public lands was broad and unfettered. *Id.* at 397-98.

On appeal, the water districts argue that the district court erred in granting summary judgment as to Count VI. They urge us to find that Section 4-I and the Omnibus Adjustment Act of 1926 (OAA) impose upon the Secretary of the Interior a special responsibility towards the water districts, a responsibility which includes making profits for the water districts through grazing leases. We are not persuaded.

Congress plainly has plenary power over the management of federal lands under the United States Constitution, art. IV, § 3, cl. 2. We agree with the DOI that Congress "has delegated to the BLM and the BOR the authority to enter into land management agreements" through the enactment of various statutes to that end. Aplt. Reply Br. at 26 (citing, inter alia, Federal Land Policy and Management Act, 43 U.S.C. § 1737 (1994); Federal Water Project Recreation Act, 16 U.S.C. §§ 460*l*-18 (1994); Reclamation Act of 1902, 43 U.S.C. § 373) (1994). More specifically, as the district court correctly stated, "the Reclamation Act of 1902 grants the Secretary of Interior broad authority 'to perform any and all acts

-16-

and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect.'" App. vol. II, at 397-98 (*quoting* 43 U.S.C. § 373).

The plain language of Section 4-I and the OAA simply does not lend itself to the interpretation which the water districts argue it should be given. First, we do not agree that the DOI is required to administer and manage the water project lands in such a way that profits are generated. Although Section 4-I does refer to profits from grazing leases, that provision only directs how such profits, if any, are to be distributed and does not require that profits in fact be made. 43 U.S.C. § 501. Second, we agree with the district court that Section 4-I "does not create a fiduciary duty to the Districts." App. vol. II, at 397. Likewise, the OAA does not create such a duty. Although one provision of the OAA states that the purpose of the act is "the rehabilitation of the several reclamation projects and the insuring of their future success by placing them upon a sound operative and business basis," 43 U.S.C. § 423f (1994), and directs the DOI to administer those sections of the act "to those ends," *id.*, this language, without more, does not create a fiduciary duty in the DOI towards the water districts. *See, e.g., Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 633-34 (10th Cir. 1998) (discussing creation of trust by Congress through manifestation of intent to create a fiduciary responsibility).

We also observe that the legislative history of the two acts relied upon by the water districts further undercuts their argument. As we discuss above, these statutes were enacted by Congress in an attempt to rescue and rehabilitate the federal irrigation projects, which had fallen on hard times at several different junctures during the first half of the Twentieth Century. Congress's concern, stated clearly in the fact finders' report and various statutes, was that the reclamation fund was becoming insolvent because the water districts were not repaying their obligations to the federal government. *See* S. DOC. NO. 68-92, at 106-07 (1924). We do not believe that Congress was attempting to put the water districts under the protective care of the DOI, but rather was simply trying to find a way to help the water districts repay the money that they owed the federal government so that the reclamation fund would have cash in its coffers. *Id.* To that extent, the water districts are correct in terming Section 4-I an "entitlement" given to the water districts by the federal government. Aple. Br. at 35. But the creation of an entitlement is different from the creation of a fiduciary duty on the part of the DOI towards the water districts. *See Branson Sch. Dist.*, 161 F.3d at 634 (distinguishing between words creating "'honorary' obligation" and words evincing intent to create fiduciary obligation). We can discern no congressional intent to create such a duty in the statutes or the history surrounding their enactment.

We **AFFIRM** the judgment of the district court on Counts I and VI.