**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 12, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STRAWBERRY WATER USERS
ASSOCIATION, a Utah nonprofit
corporation,

        Plaintiff–Appellant,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF INTERIOR;
BUREAU OF RECLAMATION; KEN
SALAZAR, Secretary of the Interior;
LARRY WALKOVIAK, Regional
Director, Upper Colorado River
Region, Bureau of Reclamation;
RONALD JOHNSTON, Program
Director, Central Utah Project
Completion Office, Department of the
Interior; CENTRAL UTAH WATER
CONSERVANCY DISTRICT; DON
A. CHRISTIANSEN, General
Manager, Central Utah Water
Conservancy District; and JERRY D.
OLDS, Utah State Engineer,[*]

        Defendants–Appellees.

No. 07-4172

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), we substitute Ken Salazar for Gale
A. Norton and Larry Walkoviak for Rick L. Gold.

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 01-CV-295-BSJ)**

Shawn E. Draney (Keith A. Call, Scott H. Martin, and D. Jason Hawkins, with him on the briefs), Snow, Christensen & Martineau, Salt Lake City, Utah, for Plaintiff–Appellant.

David C. Shilton (Ronald J. Tenpas, Assistant Attorney General; Christopher B. Rich, Assistant Regional Solicitor, United States Department of the Interior; Kathryn E. Kovacs and Thomas K. Snodgrass, with him on the briefs), Environment & Natural Resources Division, Department of Justice, Washington, D.C., for Defendant-Appellee United States of America et al.

Edwin C. Barnes (Steven E. Clyde with him on the briefs), Clyde Snow Sessions & Swenson, Salt Lake City, Utah, for Defendant–Appellee Central Utah Water Conservancy District et al.

Before **KELLY**, **LUCERO**, and **MURPHY**, Circuit Judges.

**LUCERO**, Circuit Judge.

This case involves the interaction of water and power rights under state and federal law. Although the federal law and contracts at issue stretch back over one hundred years, the dispute before us looks to the future: The Strawberry Water Users Association ("SWUA") seeks a declaration that it has well-defined rights to develop power in the Diamond Fork System of the Central Utah Project ("CUP"). In a well-considered ruling, the district court declined to grant such a declaration, other than to declare that SWUA, the United States, and the Central Utah Water

Conservancy District ("CUWCD") must negotiate in good faith. SWUA appeals to this court seeking additional relief. Because we conclude that such relief would be premature, we decline SWUA's request.

SWUA also complains that the district court went too far in granting the United States' counterclaim for declaratory relief. The United States sought and received a declaration that, under federal law and contract, it retained the right to apply for the change of use of Strawberry Valley Project ("SVP") water and to approve such applications filed by SWUA. Misreading the district court's decision, SWUA argues that the district court improperly decided a question of state water law better left to the Utah courts. Because the district court properly confined its holding to the federal questions raised by such change applications, we reject SWUA's characterization and determine that the district court's conclusions of federal law were correct.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

**A**

The Reclamation Act of 1902, 43 U.S.C. § 371 et seq., created a "massive program to construct and operate dams, reservoirs, and canals for the reclamation of the arid lands in 17 Western States." California v. United States, 438 U.S. 645, 650 (1978). By providing reliable water supplies, these construction projects facilitated the settlement of the West, an effort organized and overseen by the

Bureau of Reclamation (the "Bureau"). Under the Act, the right to the use of

reclamation water is appurtenant to the irrigated land and vests with its beneficial

users, § 372,[1] while state law governs the adjudication of those rights, § 383.[2]

To pay for the projects, the Secretary of the Interior (the "Secretary") was

authorized to contract with the benefitting water users for repayment of the costs

of constructing, operating, and maintaining project facilities. Ickes v. Fox, 300

U.S. 82, 94-95 (1937); In re Uintah Basin, 133 P.3d 410, 415 (Utah 2006). The

property right to Bureau facilities themselves, however, remained with the federal

government. Ickes, 300 U.S. at 95.

Soon after the Bureau was created, Congress recognized that its facilities

could be used for the development of power. In the Town-sites and Power

Development Act of 1906 (the "Town-sites Act"), Congress authorized two

---

[1] "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372.

[2] Section 383 provides:

Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

avenues for power generation using Bureau facilities:  (1) federally-developed

power facilities, the operation and maintenance of which were delegated to water

users through repayment contracts ("project power"), and (2) leases of Bureau

facilities to non-federal entities for power development ("lease of power

privilege").  See § 485h(c).  Only these two forms of power development are

allowed on Bureau facilities.

By 1924, the agricultural depression of the 1920s had taken its toll.

Elephant Butte Irrigation Dist. of N.M. v. U.S. Dep't of Interior, 269 F.3d 1158,

1166-67 (10th Cir. 2001).  In an attempt to save money by reducing the

government's obligation to operate and maintain Bureau facilities, see id. at 1161,

Congress enacted the Fact Finders Act of 1924, under which operation and

maintenance of Bureau projects could be turned over to a water users association

or a water irrigation district.  See §§ 500, 501.[3]  Thereafter, the United States

---

[3] Section 501 provides:

Whenever the water users take over the care, operation, and
maintenance of a project, or a division of a project, the total
accumulated net profits, as determined by the Secretary, derived from
the operation of project power plants, leasing of project grazing and
farm lands, and the sale or use of town sites shall be credited to the
construction charge of the project, or a division thereof, and
thereafter the net profits from such sources may be used by the water
users to be credited annually, first, on account of project construction
charge, second, on account of project operation and maintenance
charge, and third, as the water users may direct.  No distribution to
individual water users shall be made out of any such profits before

(continued...)

would be obligated to deal with the associations or districts rather than thousands

of individual water users.  In re Uintah Basin, 133 P.3d at 416.

In 1939, Congress enacted the Hayden-O'Mahoney Amendment, "designed

to increase the reclamation fund by depositing into it any money made by federal

power facilities."  Elephant Butte, 269 F.3d at 1162; see § 392a.  Essentially, the

amendment designated any project power revenue for the Bureau, "except in cases

where provision has been made by law or contract for the use of such revenues for

the benefit of users of water from such project."  § 392a.[4]  While this "savings

---

[3](...continued)
all obligations to the Government shall have been fully paid.

[4] The amendment provided:

All moneys received by the United States in connection with any
irrigation projects, including the incidental power features thereof,
constructed by the Secretary of the Interior through the Bureau of
Reclamation, and financed in whole or in part with moneys
heretofore or hereafter appropriated or allocated therefor by the
Federal Government, shall be covered into the reclamation fund,
except in cases where provision has been made by law or contract for
the use of such revenues for the benefit of users of water from such
project:  Provided, That after the net revenues derived from the sale
of power developed in connection with any of said projects shall
have repaid those construction costs of such project allocated to
power to be repaid by power revenues therefrom and shall no longer
be required to meet the contractual obligations of the United States,
then said net revenues derived from the sale of power developed in
connection with such project shall, after the close of each fiscal year,
be transferred to and covered into the General Treasury as
"miscellaneous receipts" . . . .

(continued...)

-6-

clause" permitted water users to continue to receive project power revenue under existing contracts, the Hayden-O'Mahoney Amendment precluded water users from receiving the net profits of future project power developments. Lease of power privilege contracts, however, were unaffected because facilities governed by such contracts are not "constructed by the Secretary of the Interior through the Bureau of Reclamation, and financed in whole or in part with moneys heretofore or hereafter appropriated or allocated therefor by the Federal Government." Id.

**B**

Against this backdrop, we turn to the development of the SVP, the Reclamation project at the center of this case. In 1905, pursuant to the Reclamation Act, the Secretary authorized construction of the SVP to divert and store waters from tributaries of the Duchesne River and convey those waters through the Wasatch Mountains for use on lands in southern Utah County. The centerpieces of the SVP were the Strawberry Dam and the Strawberry Reservoir, which had a capacity of approximately 270,000 acre-feet of water.

In anticipation of the SVP's construction and in accordance with § 383, the Bureau filed Application No. 79 for appropriation of 100,000 acre-feet of water with the Utah State Engineer in 1904. In re Uintah Basin, 133 P.3d at 415. The

---

[4](...continued)
§ 392a.

State Engineer approved the application in 1906, subject to the actual appropriation and beneficial use of the water. Id. at 415-16. In 1933, when the appropriation was complete, the State Engineer issued Certificate of Appropriation No. 2115 (later designated as Water Right No. 43-3001) for 100,000 acre-feet as described in the application. Id. at 416 & n.8.

SWUA was organized in 1922 to represent the interests of SVP water users in their dealings with the United States, to assume the obligations of those users to repay the United States the outstanding construction costs, to take over operation and maintenance of the SVP, and to assume the obligation of delivering and distributing SVP water to its users. SWUA and the United States entered into a series of contracts spelling out their respective rights and obligations. Under a 1926 Contract, SWUA took over care and responsibility for the SVP. In 1940, SWUA entered into another contract, "superced[ing] and tak[ing] the place of" the 1926 Contract, requiring that, among other things, SWUA operate the SVP in compliance with federal reclamation law.

Under these contracts, SWUA also took over the care, operation, and maintenance of the power system built on SVP facilities. In exchange, it was permitted to further develop the SVP power system and collect revenues from power generated. In accordance with these provisions, SWUA maintained the Upper Spanish Fork Power Plant, originally constructed by the Bureau in 1908, and built the Lower Spanish Fork Power Plant in 1941. As a result, the SVP

power system has generated revenues for SWUA since 1926. As the contracts explain, however, legal title to both plants has always remained in the United States, and "no additional capital investment in said power system shall be made by [SWUA] unless and until approved by the Secretary."

Congress authorized construction of the CUP in 1956. § 620 et seq. A part of the CUP, the Bonneville Unit, was designed to replace or update much of the SVP. Essential to this expansion was the Soldier Creek Dam, replacing the Strawberry Dam and creating the Enlarged Strawberry Reservoir, which has a capacity of approximately 951,360 acre-feet of water. In essence, the Bonneville Unit was built over the SVP, and SVP water is "comingled" with CUP water in the Enlarged Strawberry Reservoir. The Diamond Fork System of the Bonneville Unit conveys water from the Enlarged Strawberry Reservoir to Spanish Fork River, delivering SVP water to its users.

Utah created a political subdivision, CUWCD, to assist in the construction, maintenance, and operation of the CUP. As with other Bureau projects, CUWCD entered into a repayment contract with the federal government for costs associated with the CUP, including the Diamond Fork System. SWUA, on the other hand, had completed its repayment obligation regarding the SVP in 1974, In re Uintah Basin, 133 P.3d at 416, and it was not required to share the cost of CUP facility construction.

Several issues regarding SWUA's rights arose out of this new construction,

particularly as they regarded the development of power on CUP facilities that conveyed SVP water. In 1986, the Regional Solicitor's Office for the Intermountain Region of the Department of the Interior issued a memorandum (the "1986 Memorandum") analyzing the power rights of SWUA under the various contracts with the Bureau. Having undertaken operation and maintenance of SVP, the 1986 Memorandum recognized that "[t]he rights of [SWUA] to enter into a lease of power privilege or to develop power" under the 1940 Contract must be "upon terms and conditions and at rates approved by the Secretary." It set forth a number of factors the Bureau would consider "in arriving at a decision as to whether to approve or disapprove" a proposal by SWUA to develop power at Diamond Fork. However, the 1986 Memorandum noted:

> [SWUA] has no rights to [CUP] water. It has no right to the power development on [CUP] facilities. It does have certain rights as concerns [SVP] water in the area of hydroelectric development. If [SWUA] desires for its own hydroelectric purposes the use of facilities constructed for the Bonneville Unit, you would appropriately expect it to pay its proportionate share in accordance with the use of such facilities.

The 1986 Memorandum expressly acknowledges the fact that the 1940 Contract is "not a lease of power privilege [but] [r]ather is a repayment contract which also conveys to [SWUA] the right to use the property for all purposes enumerated therein."

In a 1987 Letter Agreement, SWUA and the Bureau resolved one issue relating to possible joint power development by SWUA and CUWCD in Diamond

Fork. "[F]or the purpose of determining SWUA's participation when [SVP] water is combined with Bonneville Unit water for power development in the consolidated operation of the proposed Diamond Fork Power System, such water equates to 38 percent of the hydropower produced in the Diamond Fork Power system." "This 38 percent right is a property right to develop power on a constant basis in perpetuity subject to approval by the Secretary of the Interior as required in the [1940 Contract]."

Thereafter, SWUA, the Bureau, and CUWCD entered into a contract in 1991 to address their respective rights and obligations in light of the changes brought about by the CUP, including the Enlarged Strawberry Reservoir and the Diamond Fork System. Among other things, the 1991 Contract guaranteed SWUA an allocation of 61,000 acre-feet of water each year from the Enlarged Strawberry Reservoir in lieu of its former right to use all the water in the original Strawberry Reservoir.

Articles 11 and 19 of the 1991 Contract address power generation.[5] Article 11 provides that SWUA may, without charge, nonconsumptively use any Bonneville Unit water at SWUA's existing power plants. Article 19, entitled "[SWUA] Power Rights in the Diamond Fork System," provides:

> It is acknowledged that as between [SWUA] and the United States (but not by [CUWCD]), the rights of [SWUA] to develop power

---

[5] CUWCD was not a party to Article 19.

and/or participate in the development of power in Diamond Fork as provided in the [the 1940 Contract], as confirmed by [the 1986 Memorandum], and as quantified by [the 1987 Letter Agreement], is based upon the ratio of 74,300 acre-feet annually of [SVP] water privilege to the combined total quantity of water annually delivered through the Syar Tunnel and the Diamond Fork System. It is further acknowledged that the quantification and allocation of power rights and the development of the power facilities in Diamond Fork together with the sharing of capital, operation, maintenance, replacement costs, (including the allocated cost of power), will be the subject matter of and governed by a separate contract and nothing in this Contract shall alter, modify or limit the power rights or power privileges of [SWUA], [CUWCD], or the United States.

Although CUWCD is not a party to the article 19, it separately agreed with

SWUA that:

[T]he power rights and power privileges of [SWUA] to develop the power and/or participate in the development of power in the Diamond Fork System shall be based on 74,300 acre-feet of [SVP] Power Water, as a ratio with the total combined Bonneville Unit and [SVP] releases of 195,100 acre-feet annually or 38 percent, as stated in the [1987 Letter Agreement].

Following these negotiations, in 1994, the Department of the Interior

published in the Federal Register a "Notice of Intent to Contract for Hydroelectric

Power Development in the Diamond Fork Area of the Central Utah Project (CUP)

and the Strawberry Valley Project (SVP), UT." 59 Fed. Reg. 65,380 (Dec. 19,

1994). The Notice explained that "[t]he selected potential lessee(s) will have five

years from the date of such notification to enter into a lease(s) of power privilege

for the site or sites identified in the proposal." Id. at 65,382. Pursuant to the

Notice, CUWCD and SWUA jointly submitted a proposal that was accepted by

-12-

the United States.  But SWUA, CUWCD, and the United States could not agree on certain key issues, and the five-year period expired without executing a lease. In 2001, the Department of the Interior published a withdrawal of the solicitation in the Federal Register, stating that "[s]ince the deadline for entering into a lease has now passed and a lease has not been negotiated and executed, Interior has rescinded the selection of SWUA/CUWCD as the successful potential joint lessee and has terminated this lease of power privilege process for the Diamond Fork System."  Central Utah Project Completion Act, 66 Fed. Reg. 34,713 (June 29, 2001).

## C

On August 21, 1997, while lease negotiations were ongoing, SWUA filed an Application for Permanent Change of Water with the Utah State Engineer, seeking to "update Water Right No. 43-3001" (that based on Application No. 79) and the other water rights previously obtained by the United States.  One of SWUA's stated purposes for the change was to "conform to current conditions and to provide municipal and industrial water for the inevitable urbanization of much of the [SWUA] service area."  It also sought official imprimatur for hydropower generation at the Spanish Fork Upper and Lower Power Plants, noting that "no transfer of water to lands not currently served or change in current operation is involved. . . .  Hydropower has been generated from water released under these rights for over 70 years.  Therefore, no hydrologic changes from

-13-

present conditions will occur and no vested rights will be impaired." The Bureau, CUWCD, and others filed protests regarding aspects of SWUA's change application. On February 28, 2001, the Bureau filed its own change application to reflect changes that had occurred in places of diversion due to the CUP construction. The Bureau's application, however, did not seek municipal or industrial use. SWUA protested this application.

On August 24, 2001, the State Engineer granted both SWUA's and the Bureau's change applications insofar as they sought to change the points of diversion and add hydropower use. The State Engineer declined to permit the municipal and industrial uses SWUA proposed.

**D**

These events set the scene for the two lawsuits, consolidated in the court below, which confront us today. On April 26, 2001, SWUA filed a declaratory judgment action in United States District Court for the District of Utah, case number 01-CV-295, seeking recognition that it has the right to develop and profit from power generation in the Diamond Fork System and that the Bureau and CUWCD must stop interfering with or threatening to interfere with this right. Specifically, SWUA requested a declaration that "the 1991 Contract is enforceable against and binding upon all parties."

Around the same time, SWUA filed multiple actions in Utah state court. It filed petitions for interlocutory decrees in two different counties regarding Utah's

-14-

general adjudication of the SVP water rights that had been pending since 1936. See In re Uintah Basin, 133 P.3d at 412-13. It also filed a complaint in state court, joining the United States as defendant, seeking judicial review of the Utah State Engineer's August 21, 2001 decision regarding SWUA's and the Bureau's change applications. By right, the United States removed this latter action to federal court on April 29, 2002. This action was assigned case number 01-CV-344 and, over SWUA's objections, consolidated with case number 01-CV-295. SWUA moved the district court to refrain from deciding 01-CV-344 in light of the petitions that remained under consideration in state court. That motion was denied. In its answer to the consolidated federal case, the United States counterclaimed, seeking a declaration that "the actions of [SWUA] in filing a change of use application on water rights belonging to the United States for the [SVP], and purporting to change the use of such water rights, is illegal in violation of 43 U.S.C. §§ 521 and 485h(c)."

While the consolidated case was pending before the federal district court, the Utah Supreme Court issued an opinion in the ongoing state court proceedings. Considering only Utah law, and without the 1991 Contract before it, that court held that SWUA was an appropriate party to file change applications relating to SVP water rights titled to the Bureau because SWUA's shareholders were the beneficial users of SVP water. In re Uintah Basin, 133 P.3d at 422-23. The Utah Supreme Court explicitly deferred to the ongoing dispute in federal court as to

-15-

whether the United States "retains the ultimate approval authority [under federal law] with respect to both the distribution of project water and any change of place or purpose of use that might be contemplated." Id. at 423 (quotation omitted).

With the 1991 Contract before it, the federal district court issued a memorandum opinion on March 3, 2006 ("March 2006 Memorandum Opinion") holding that SWUA must obtain the United States' approval to file change applications on reclamation water rights and that federal law and relevant contracts reserved to the United States the authority to change the use of reclamation project water or points of diversion.

All other issues having been resolved by settlement or prior order, SWUA then confirmed that it sought but an order from the district court directing CUWCD and the Bureau to deal with SWUA in good faith in the future. In a subsequent Memorandum Opinion, Declaratory Judgment and Order, issued June 7, 2007 ("June 2007 Memorandum Opinion") the district court expressly affirmed the validity and enforceability of the 1991 Contract between SWUA, the Bureau, and CUWCD, and elaborated on the reasons for its denial of relief related to the possible future exercise of power development rights. As the joint proposal submitted by SWUA and CUWCD had expired under the Bureau's five-year deadline and SWUA admitted that it had not independently submitted a power development proposal, the district court concluded that until such a proposal was submitted it would not assume the Bureau and CUWCD would respond in bad

-16-

faith.

The district court ordered that the June 2007 Memorandum Opinion, together with its March 2006 Memorandum Opinion, constituted a declaratory judgment entered by the court. It then issued judgment consistent with these rulings on June 7, 2007. SWUA appeals.

**II**

SWUA brings two claimed errors for our consideration. First, regarding power development rights, SWUA contends that the district court should have declared that SWUA owns a property right to develop power in the Diamond Fork System. It not only asks us to reverse the judgment and remand this issue to the district court but also to directly enter declaratory relief to this effect.

Second, SWUA argues that the district court should have refrained from deciding whether the United States reserved the right to approve change applications. SWUA also objects to the substance of that decision: that SWUA may not file a change application without the United States' approval or voluntary joinder.

**A**

We first consider the extent of declaratory relief granted by the district court. In the June 2007 Memorandum Opinion, the district court declared that the 1991 Contract was valid and enforceable, that Article 19 incorporated by reference the 1986 Memorandum, and that all parties to the 1991 Contract are

bound by the implied covenant of good faith.  Noting, however, that under Article 19, "'the quantification and allocation of power rights and privileges of the power facilities in Diamond Fork' as well as the allocation of the associated costs 'will be the subject matter of and governed by a separate contract,'" the court concluded that:

> It seems premature at this point to attempt to fashion some form of affirmative equitable relief that would compel the United States or CUWCD to respond in a particular manner to a power development proposal that SWUA has neither formulated nor submitted.  Counsel for the United States and CUWCD represented that any future SWUA proposal would be greeted with an attentive and reasonable response, and this court anticipates that ordinarily, people will receive, consider and respond to any rational proposal in good faith.

> Counsel for SWUA has not persuaded this court that at this point it may lawfully decree anything more.

SWUA challenges this decision declining to extend further declaratory relief.

Specifically, SWUA claims the district court should have further declared that:  (1) SWUA has a property right to profit from any electrical energy generated with SVP waters; (2) SWUA is required to pay its proportionate share of power generating facilities but is not required to pay any share of the costs of developing upstream facilities for CUP; and (3) the United States and CUWCD must cooperate in good faith with SWUA to develop and implement a reasonable proposal that allows SWUA to develop its power rights in the Diamond Fork System consistent with the ratios expressed in the 1991 Contract and incorporated documents.  It also asks us to enter such relief.

**1**

SWUA maintains that we review this decision de novo and that we may even "expand upon it as needed to declare the rights of SWUA."  As authority, SWUA points to Nautilus Insurance Co. v. 8160 South Memorial Drive, LLC, 436 F.3d 1197 (10th Cir. 2006), in which we stated that "the substance of a declaratory judgment is reviewed just like any other district court decision:  legal questions are reviewed de novo."  Id. at 1199 n.1 (quotation omitted).  In response, the government and CUWCD argue that we review the district court's decision to refrain from granting further declaratory relief for abuse of discretion. We agree with the defendants.

SWUA does not challenge the power rights substance of the declaratory relief entered by the district court, as far as it went.  The declaratory judgment in this respect was precisely what SWUA requested:  The 1991 Contract remains valid and enforceable and all parties to it have a continuing obligation of good faith and fair dealing.  Were SWUA challenging the legal correctness of this conclusion, Nautilus Insurance Co. would mandate de novo review.  Instead, SWUA's objection is that the relief granted did not go far enough.  This challenge presents a different question:  Did the district court err by declining to further declare SWUA's rights?  We consider this question under an abuse of discretion standard.  Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1240 (10th Cir. 2008); see 28 U.S.C. § 2201(a).

-19-

Under the Declaratory Judgment Act,

> (a) In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, <u>may</u> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

§ 2201(a) (emphasis added).  Critically, the language of the act is permissive, not compulsory.  Just as the district court possesses discretion to grant <u>any</u> declaratory relief in the first instance (if, of course, the court has jurisdiction), so too does it possess discretion to determine the <u>extent</u> of that relief.  <u>Id.</u>; <u>Surefoot LC</u>, 531 F.3d at 1240 ("[E]ven where a constitutionally cognizable controversy exists, the Act stipulates only that district courts 'may'—not 'must'—make a declaration on the merits of that controversy . . . .").  In conducting this inquiry, the district court considers a number of factors.  <u>State Farm Fire & Cas. Co. v. Mhoon</u>, 31 F.3d 979, 983 (10th Cir. 1994) (White, J.).  "[T]his circuit has repeatedly . . . held that on appeal it will not engage in a de novo review of all the various fact-intensive and highly discretionary factors involved.  Instead, it will only ask whether the trial court's assessment of them was so unsatisfactory as to amount to an abuse of discretion."  <u>Id.</u>; <u>see also</u> <u>Surefoot LC</u>, 531 F.3d at 1240 ("[B]ecause the [decision whether to exercise declaratory judgment authority] necessarily involves a discretionary assessment of disparate, often incommensurate, and case-specific concerns, we have indicated that we will review a district court's decisions on that score only for abuse of discretion."

-20-

(citation omitted)).  Even <u>Nautilus Insurance Co.</u>, the case SWUA cites on this issue, establishes that "[a] district court's decision to exercise its discretion and issue a declaratory judgment will not be overturned absent a showing of clear abuse of . . . discretion."  436 F.3d at 1199 (quotation omitted).

**2**

We discern no support for the position that the district court abused its discretion under the Declaratory Judgment Act.  Quite to the contrary, the record wholly supports the district court's cogent conclusion that "[i]t seems premature at this point to attempt to fashion some form of affirmative equitable relief that would compel the United States or CUWCD to respond in a particular manner to a power development proposal that SWUA has neither formulated nor submitted." As SWUA conceded before the district court, it has yet to present the Bureau or CUWCD with a Diamond Fork power proposal except the joint CUWCD-SWUA proposal that expired in 2001.  Other than the implied covenant of good faith, the 1991 Contract expressly postpones further delineation of the parties' rights to power development in Diamond Fork for a future agreement.

SWUA contends that it owns a power privilege in the Diamond Fork System merely by virtue of its water ownership.  Accordingly, SWUA asserts that a lease of power privilege is unnecessary.  Based on the relevant federal statues and contacts, we disagree.

SWUA is entitled to receive any net profits arising from the operation of

-21-

the SVP power system because of the Fact Finders Act, § 501, and its agreement in the 1926 Contract to operate and maintain the SVP. As SWUA acknowledges, this was a "project power" arrangement: the power system had initially been built by the federal government, title remained with the United States, and SWUA gained the right to the net profits under a repayment contract.

When Congress enacted the Hayden-O'Mahoney Amendment in 1938, § 392a, it provided that water users could no longer receive project power revenues unless the savings clause applied. The parties agree that SWUA's right to profits from the SVP power system were saved by this clause. But the savings clause does not encompass power developed on new projects, such as the CUP facilities in Diamond Fork. Rather, SWUA must enter into a lease of power privilege arrangement if it is to profit from these new facilities. SWUA's right to profit from power development does not derive, as it claims, from the mere fact that its water passes through the power system. Rather, it acquires such rights through federal government contracts. Were it otherwise, article 23 of the 1926 Contract, which grants SWUA project power in addition to its water right, would have been superfluous. Similarly, the Hayden-O'Mahoney Amendment would have been of no consequence, as every water association and district would have already been entitled to power profits by virtue of their water rights. Such a state of affairs would fly in the face of the Amendment's intent to direct these profits to the Bureau.

SWUA's own agreements and actions under the 1991 Contract confirm this understanding of the distinction between the existing SVP power system and the hypothetical Diamond Fork power system. The two systems are addressed under separate articles of the 1991 Contract. Article 11 affirms SWUA's right to "nonconsumptively use any Bonneville Unit water . . . for the generation of electrical energy at [SWUA's] existing power plants." (Emphasis added). In contrast, article 19 addresses "the rights of [SWUA] to develop power and/or participate in the development of power in Diamond Fork." (Emphasis added). If SWUA's right to Diamond Fork power derived inexorably from its right to SVP power, this distinction would have been entirely unnecessary. Further, that SWUA for many years pursued "a separate contract" for Diamond Fork power as envisaged by article 19 belies its current position that such a contract is unnecessary to vindicate its alleged power rights.

Because SWUA must enter a lease of power privilege to profit from power development in Diamond Fork, the district court did not abuse its discretion by declining to opine on how negotiations surrounding such a lease might unfold. Article 19 of the 1991 Contract expressly and unambiguously "acknowledge[s] that the quantification and allocation of power rights and the development of the power facilities in Diamond Fork together with the sharing of capital, operation, maintenance, replacement costs, (including the allocated cost of power), will be the subject matter of and governed by a separate contract." Thus, the 1991

-23-

Contract itself contemplates that the issues now of concern to SWUA, including the appropriate allocation of facilities costs that contribute to power allocation on Diamond Fork, would be addressed through negotiation and a future contract. Assuredly the district court did not abuse its discretion by declining to intervene in hypothetical future negotiations.[6]

Our decision in Norvell v. Sangre de Cristo Development Co., 519 F.2d 370 (10th Cir. 1975), in which we reversed a grant of declaratory relief, is instructive. At issue was the district court's declaration that certain state statutes would apply to buildings yet to be constructed. Id. at 376. As here, we constrained our review to whether the district court had abused its discretion in granting declaratory relief at all. We concluded that the district court had abused its discretion, as "we d[id] not know whether the development project shall go forward or, if ultimately authorized following the environmental considerations, the precise activities which may be permitted on the leased lands." Id. Just as in Norvell, the district court in this case did not know how a nonexistent power development proposal would comport with the conditions set forth in the 1991 Contract or its

_____

[6] This is not to say that SWUA is correct that under the district court's decision it is in no better position than "a stranger" to such negotiations. The 1991 Contract, both directly and by its incorporation of the 1986 Memorandum and the 1987 Letter Agreement, appears to set conditions on how obligations and profits in Diamond Fork power will be apportioned. However, the district court was entirely within its discretion under the Declaratory Judgment Act to decline to declare how these conditions must be incorporated into a hypothetical proposal or its negotiations.

predecessors. If "declaratory judgments are improper when, as here, ongoing activity may radically change the factual situation," id. at 378, surely it is not an abuse of discretion to refrain from entering such a judgment.

Because the district court did not abuse its discretion in declining to grant further declaratory relief, we need not consider whether this court may directly enter further relief.[7] Assuming we have such power, we decline to exercise it.

**B**

SWUA's second challenge regards its authority to file change applications before the Utah State Engineer concerning SVP water. It argues that it is the proper party to file change applications and that consent of the United States is unnecessary. In its March 2006 Memorandum Opinion, the district court concluded:

> The United States remains the legal owner and appropriator of record

---

[7] SWUA objects that the district court did not order the United States and CUWCD "to cooperate in good faith with SWUA to develop and implement a reasonable proposal that allows SWUA to develop its power rights in the Diamond Fork System consistent with the ratios expressed in the 1991 Contract and incorporated documents." To the extent SWUA seeks a declaration that the parties are bound to negotiate in good faith, the district court precisely so declared: "[A]ll of the parties to the 1991 Contract remain bound by the implied covenant of good faith and fair dealing to act in good faith concerning SWUA's exercise of its rights to use SVP water for purposes of power development, including but not limited to the negotiation of the separate agreement concerning power development that was contemplated by Article 19 of the 1991 Contract." Insofar as SWUA asks this court to define the exact contours of what "good faith and fair dealing" requires in this context, we agree with the district court that such a declaration would be premature for the reasons already described.

of rights to water delivered from the enlarged Strawberry Reservoir as reflected in certificates of appropriation issued in its own name. Under federal reclamation law and federal contracts, including the 1991 Contract, the United States retains the authority to file applications for change of purpose or place of diversion or use of Strawberry project waters and to approve change applications filed by SWUA (or its shareholders) pertaining to water rights to Strawberry project water held in the name of the United States, provided that the United States cannot act in derogation of the rights and entitlements of the ultimate users of Strawberry project water in whose interest it is obliged to act, consistent with the purposes of the federal project, the federal statutes and the 1991 Contract.

SWUA first claims that the district court should have refrained from deciding the United States' counterclaim on this issue, arguing that it is a question of state law. In any event, SWUA argues that the district court substantively erred because its decision conflicts with Utah state law and, in particular, the Utah Supreme Court's In re Uintah Basin decision.

**1**

In its counterclaim, the United States sought a declaration that federal law and the relevant contracts between the parties reserved to the United States the authority to change the use of reclamation project water or points of diversion. In response, SWUA asked the district court to refrain from exercising Declaratory Judgment Act jurisdiction over the counterclaim for reasons of federalism: The matter was raised in the petitions pending in Utah state court and "[t]he issues presented were uniquely issues of state water law, and thus more appropriately decided by the Utah state courts." As all parties agree, we review the district

-26-

court's decision to accept jurisdiction for an abuse of discretion. Surefoot LC, 531 F.3d at 1240.

We conclude that the district court did not abuse its discretion by exercising jurisdiction over the United States' counterclaim. Far from presenting only issues of state law as claimed by SWUA, the United States' counterclaim rested, at least in part, on federal law. Specifically, the United States sought a declaration that "the actions of [SWUA] in filing a change of use application on water rights belonging to the United States for the [SVP], and purporting to change the use of such water rights, is illegal in violation of 43 U.S.C. §§ 521 and 485h(c)." (Emphasis added). The United States also relied on the absence of authority in any of the relevant contracts allowing SWUA to unilaterally change the use of project water from irrigation to municipal and industrial use. As this court recognized in United States v. City of Las Cruces, 289 F.3d 1170 (10th Cir. 2002), "[t]he obligations to and rights of the United States under its contracts are governed exclusively by federal law." Id. at 1186 (quotation omitted). Thus, we cannot agree with SWUA's position that the federal government's counterclaim presented "uniquely issues of state water law."

SWUA further argues that under the factors we set forth to guide district courts considering whether to exercise discretion in a declaratory judgment action, see Mhoon, 31 F.3d at 983, the district court abused its discretion because its ruling increased friction between the federal courts and the Utah state courts.

-27-

Relatedly, SWUA claims that there was an alternate and more effective remedy in Utah state court.  In reality, the opposite is true.

Although SWUA heavily relies on In re Uintah Basin, the Utah Supreme Court in that case carefully circumscribed the state law boundaries of its decision and expressly left to the federal court interpretation of the federal statutes and contracts at issue.  133 P.3d at 423 ("We have addressed the [state law question], but must now defer to the federal court for construction of the federal statutes as well as the contracts between the parties.").  No friction results when state and federal courts cooperatively work toward the resolution of disputed issues.

Moreover, SWUA's argument that a Utah state court remedy would have been more effective lacks merit.  To the contrary, because the Utah Supreme Court explicitly deferred to the federal district court's construction of federal law and contracts, it seems apparent that, if left to the state court, the issues raised by the counterclaim could have remained unresolved.  We therefore proceed to consider the merits.

**2**

As a matter of Utah law, the district court recognized that because shareholders of SWUA are the beneficial users of SVP water, SWUA has authority to initiate change applications.  See In re Uintah Basin, 133 P.3d at 420-23; see also Utah Code § 73-3-3.  Nonetheless, because the United States retained legal title to SVP water, the district court also concluded that "[a]t a minimum,

the United States . . . must voluntarily join in a SWUA initiated application before the State Engineer." It further held that "[u]nder federal reclamation law and federal contracts, including the 1991 Contract, the United States retains the authority to file applications for change of purpose or place of diversion or use of Strawberry project waters and to approve change applications filed by SWUA." Unlike the issues above, these are legal conclusions that we review de novo. Nautilus Ins. Co., 436 F.3d at 1199 n.1.

SWUA characterizes the district court's ruling as declaring that "the United States alone must file any change application involving SVP water rights," which it argues is incorrect as a matter of state law. In SWUA's view, this ruling contradicts In re Uintah Basin, which explained that "[b]eneficial use shall be the basis, the measure and the limit of all rights to the use of the water in this state." 133 P.3d at 420. Because SWUA's shareholders are the beneficial users of SVP water, id. at 421, SWUA claims that it has the exclusive state law right to file change applications before the State Engineer, see id. at 420-23; see also § 73-3-3.

This argument mischaracterizes the district court's decision. Contrary to SWUA's argument, the court did not rest its conclusions on state law. Rather, its ruling relied on federal law and the relevant contracts. (See, e.g., Appellant's App'x 3896 ("[U]nder the federal statutes, the project history, and the 1991 Contract [the United States] . . ."); id. at 3907 ("Under federal reclamation law

-29-

and federal contracts, including the 1991 Contract, the United States retains the authority to file [change] applications . . .").)  The district court was equally clear that the United States' authority to file change applications would be subject to additional state law constraints.  (Id. at 3896 ("[T]he United States has its own constraints.  What it does must be for the benefit of the project and of the project water users and in compliance with the federal statutes, the contracts, and the applicable Utah water law.").)

We perceive no conflict between the district court's judgment and In re Uintah Basin.  From that decision we discern three clear holdings.  First, because the shareholders of SWUA are the beneficial users of SVP water, SWUA has authority under Utah law to initiate a change application before the State Engineer.  133 P.3d at 420-23; see § 73-3-3.  Second, the United States does not "alone ha[ve] the authority to file a change application."  In re Uintah Basin, 133 P.3d at 423.  Third, federal law and relevant federal contracts control whether the "federal government retains the ultimate approval authority with respect to both the distribution of project water and any change of place or purpose of use that might be contemplated."  Id. (quotation omitted).

None of these holdings was contradicted in the district court's orders in our present case.  First, the district court decided that, under federal law, because the United States retained legal title to the water, it "must voluntarily join in a SWUA initiated application before the State Engineer."  (Emphasis added).  This

-30-

statement plainly recognizes SWUA's authority to initiate a change application before the Utah State Engineer. We thus reject SWUA's insistence that the district court concluded that "the United States alone must file any change application involving SVP water rights," as inherently at odds with the court's clear statement. Second, the district court expressly recognized that In re Uintah Basin vindicated SWUA's claim to equitable ownership of SVP water on behalf of its shareholders. Third, as explained above, the district court did not base its holdings on state law. Rather, it expressly and repeatedly rested its conclusions on federal law and relevant contracts. Both the Utah Supreme Court and the district court carefully avoided encroaching on the other's turf.

We read the district court's decision expressly and narrowly: The "United States retains the authority to file applications for change of purpose or place of diversion or use of Strawberry project waters and to approve change applications filed by SWUA." (Emphasis added). This is simply a statement of federal law and contract—the United States never relinquished, either in the Reclamation Act or any of the contracts at issue—any right it has to change the use of SVP water. The district court did not rule that the United States may properly file a change application under Utah law. That is a question of state law, see § 73-3-3, one that the Utah Supreme Court expressly declined to resolve, In re Uintah Basin, 133 P.3d at n.11 ("We do not foreclose the possibility that in the proper circumstance the United States should be allowed to file the change application. . . . We need

not determine [that issue] since it is only the right to file belonging to [SWUA] that has been challenged."). Quite correctly, the district court concluded that federal law and relevant contracts <u>reserved</u> to the United States the right to approve "any change of use of the SVP water rights." This is precisely the relief sought by the counterclaim, as acknowledged by the United States in its brief to this court. (United States' Br. 14 ("The counterclaim sought, <u>inter alia</u>, a declaration that SWUA's filing of applications to change the use of and points of diversion for project water violated provisions of the Reclamation Act <u>reserving</u> to the United States the authority to change the use of project water or points of diversion.").)[8] The district court did not address what rights the United States may have under Utah law. <u>See also</u> <u>In re Uintah Basin</u>, 133 P.3d at n.11.

Correctly understood, the district court's conclusions are uncontroversial applications of federal law. SWUA asserts that it may file change applications seeking to change the purpose of use for SVP water to provide for municipal and

---

[8] Admittedly, the district court's statements regarding this issue are not entirely clear. For example, the court states: "May the United States, as the legal owner and appropriator of record initiate a change application before the State Engineer? The short answer is 'yes.'" Read in context, however, this isolated statement is not a conclusion of state law. In the very next sentence, the district court explains that the "United States has its own constraints. What it does must be for the benefit of the project and of the project water users and in compliance with the federal statutes, the contracts, <u>and the applicable Utah water law</u>." By acknowledging that the United States is constrained by "applicable Utah water law," the district court made clear its concern for respecting the authority of Utah courts as final arbiters of Utah law.

industrial use without the United States' approval.  But federal law clearly requires the consent of the United States for such changes.  See California, 438 U.S. at 668 n.21 ("[S]tate water law does not control in the distribution of reclamation water if inconsistent with other congressional directives to the Secretary." (citation omitted)); Israel v. Morton, 549 F.2d 128, 132-33 (9th Cir. 1977) ("Project water . . . is not there for the taking (by the landowner subject to state law), but for the giving by the United States.  The terms upon which it can be put to use, and the manner in which rights to continued use can be acquired, are for the United States to fix.").  "From the very beginning of the reclamation program, Congress has restricted the use of water released from reclamation projects," Jicarilla Apache Tribe v. United States, 657 F.2d 1126, 1138 (10th Cir. 1981), and these restrictions are exceptions to the general rule embodied in 43 U.S.C. § 383 that state law governs the control, appropriation, use, and distribution of reclamation water, see California, 438 U.S. at 668 n.21.

Federal law recognizes that a change in the use of project water from irrigation to municipal and industrial use—what SWUA seeks in its change applications—requires a contract with the Secretary.  "Originally the federal reclamation laws made provision only for water to be used in irrigation."  Jicarilla Apache Tribe, 657 F.2d at 1138.  Over time, Congress has authorized changes of reclamation project water use to certain non-irrigation purposes, but only under restrictive conditions and pursuant to contracts with the Secretary.  See, e.g.,

-33-

§ 567 (providing that the Secretary "may enter into contract with . . . towns" to provide the towns with reclamation water).  For example, under the Sale of Water for Miscellaneous Purposes Act, the Secretary is authorized to enter into contracts to supply reclamation project water for non-irrigation purposes.  See § 521 ("The Secretary of the Interior in connection with the operations under the reclamation law is authorized to enter into contract to supply water from any project irrigation system for other purposes than irrigation, upon such conditions of delivery, use, and payment as he may deem proper . . . .").  Of particular relevance to SWUA's claims is § 485h(c), which deals directly with non-irrigation uses:

> The Secretary is authorized to enter into contracts to furnish water for municipal water supply or miscellaneous purposes:  Provided, . . . No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes.

These provisions do not authorize water users to change the use of project water without approval by and a contract with the Secretary.

On close review, the relevant contracts between SWUA and the United States do not include a provision in which the Secretary accedes to a change from irrigation to municipal and industrial use.  The contracts simply recognize that the SVP is an "irrigation project," the authorized purposes of which are "irrigation and power."  The contracts obligate SWUA to manage the SVP in conformity with federal reclamation law, see, e.g., 1940 Contract ¶ 14(b) (obligating SWUA

-34-

to operate and maintain SVP "in full compliance with the reclamation law as it now exists (and as it may hereafter be amended)"), which, as we have described above, requires the consent of the Secretary in order to change from irrigation to municipal and industrial uses. As such, the district court did not err in concluding that the United States retains the authority to approve change applications filed by SWUA. Accordingly, we reject SWUA's argument that it has the right to change the use of SVP water from irrigation to municipal and industrial uses simply by virtue of its state-law equitable ownership interest. See Jicarilla Apache Tribe, 657 F.2d at 1138-40 (concluding that state law cannot authorize a use of project water that would conflict with applicable federal reclamation statues).

## III

For the reasons stated, we **AFFIRM** the judgment of the district court.